[Cite as *State v. Morgan*, 2019-Ohio-3691.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-103 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-132 |
| | : | |
| ISSAC ALEXANDER MORGAN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of September, 2019.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
       Attorney for Plaintiff-Appellee

KIMBERLY MELCHOR, Atty. Reg. No. 0093843, 214 West Monument Avenue, Dayton, Ohio 45402
       Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** Defendant-appellant, Issac Alexander Morgan, appeals from his conviction in the Clark County Court of Common Pleas after a jury found him guilty of multiple counts of rape and kidnapping and one count of felonious assault. In support of his appeal, Morgan contends that his conviction for each offense was not supported by sufficient evidence and was against the manifest weight of the evidence. Morgan also contends that his trial counsel provided ineffective assistance, that he was denied a fair trial due to pre-indictment delay, and that the trial court erred in granting the State a trial continuance for purposes of locating and serving a subpoena on a key witness. For the reasons outlined below, the judgment of the trial court will be affirmed.

## Facts and Course of Proceedings

**{¶ 2}** On March 15, 2016, the Clark County Grand Jury returned an indictment charging Morgan with two counts of rape in violation of R.C. 2907.02(A)(2), two counts of kidnapping in violation of R.C. 2905.01(A)(4), and one count of felonious assault in violation of R.C. 2903.11(A)(1). Each of the counts included a three-year firearm specification.

**{¶ 3}** The aforementioned charges stemmed from allegations that Morgan sexually assaulted two female prostitutes while holding them at gunpoint outside of South High School near Clifton Avenue in Springfield, Ohio. It was alleged that on May 25, 2015, Morgan kidnapped and raped the first victim, D.C., after D.C. declined Morgan's offer to pay for sex. It was also alleged that Morgan committed felonious assault on D.C. by pushing her to the ground and striking her in the face with his handgun. With regard to

the second victim, C.R., it was alleged that on July 13, 2015, Morgan kidnapped and raped C.R. at gunpoint after C.R. had initially accepted Morgan's offer to pay for sex.

{¶ 4} Morgan initially pled not guilty to the charges. Following his not guilty plea, Morgan filed several pretrial motions, including a Crim.R. 14 motion for relief from prejudicial joinder. In that motion, Morgan requested that the trial court sever the rape, kidnapping, and felonious assault charges related to D.C. from the rape and kidnapping charges related to C.R. In support of the motion, Morgan argued that the joinder of those offenses prejudiced him because there was a risk that the jury would use the evidence in one case to bolster the allegations in the other case. The trial court, however, disagreed and overruled Morgan's motion.

{¶ 5} Shortly thereafter, Morgan accepted a plea agreement and pled guilty to one count of rape with the accompanying firearm specification. In exchange for Morgan's guilty plea, the State dismissed the remaining charges and specifications. At sentencing, the trial court sentenced Morgan to ten years in prison for rape and a mandatory three years in prison for the firearm specification. The trial court ordered the three-year prison sentence for the firearm specification to be served prior and consecutive to the sentence for rape, thus amounting to a total, aggregate sentence of 13 years in prison. The trial court also designated Morgan a Tier III sex offender. Morgan then appealed.

{¶ 6} On appeal, Morgan challenged the knowing, intelligent, and voluntary nature of his guilty plea. Upon review, this court found merit to Morgan's claim and reversed his guilty plea on grounds that the trial court failed to substantially comply with Crim.R. 11(C)(2)(a). *State v. Morgan*, 2018-Ohio-319, 104 N.E.3d 941, ¶ 17 (2d Dist.). Specifically, this court found that "[t]he trial court failed to inform Morgan that he was

subject to a mandatory prison term before it accepted his guilty plea to the rape count." *Id.* "The trial court also failed to inform Morgan that because the prison time was mandatory for a rape conviction, he was ineligible for community control sanctions in lieu of prison." *Id.* "Furthermore, the plea form signed by Morgan incorrectly stated that a mandatory prison term was 'not applicable' to his conviction for rape." *Id.* Based on these errors, this court found that Morgan's guilty plea was not made knowingly, intelligently, and voluntarily. *Id.* The matter was therefore reversed and remanded back to the trial court for further proceedings.

{¶ 7} On remand, the trial court held a pretrial conference during which Morgan notified the court that he no longer wanted to plead guilty and instead wanted to move forward with a jury trial. As a result, the trial court scheduled a jury trial to take place on July 24, 2018. On the day of trial, the State advised the trial court that, despite multiple efforts, it had been unable to locate D.C. for purposes of serving her with a subpoena ordering her to appear at trial. Since D.C. was not present for trial, Morgan moved the trial court to prevent the State from presenting any evidence that related to the charges involving D.C. The trial court granted the motion, which prompted the State to move for a trial continuance so that it could locate D.C. and serve her with a subpoena. Although recognizing the last-minute nature of the State's request, the trial court granted the State a short, three-week trial continuance until August 14, 2018. D.C. thereafter appeared for trial as scheduled.

*Trial Testimony and Evidence Related to Assault on D.C.*

{¶ 8} D.C. testified that Morgan approached her and offered her money for sex as

she was walking by the area of South High School. D.C. testified that when she found out Morgan only had $5, she declined his offer and attempted to walk away. However, rather than letting her walk away, Morgan pulled D.C.'s arm, placed a handgun to her head and nose, and said: "Bitch, you gonna do what I tell you to do." Trial Trans. Vol. I (Aug. 14, 2018), p. 161. D.C. testified that Morgan then pushed her to the ground, struck her in the face with his gun, and forced her to perform oral sex on him. During this time, D.C. testified that Morgan also "tried" to put his penis in her vagina and anus. *Id.* at 168.

{¶ 9} After being assaulted by Morgan, D.C. testified that she left the scene and sought assistance from an individual on the street who called 911. The recorded 911 call was admitted into evidence and was played at trial. During the call, D.C. can be heard describing her assailant as a black male in an orange shirt with short curly hair. D.C. also can be heard stating that her assailant had a gun and that he had run down Selma Road after assaulting her outside of South High School. D.C. further stated that the attack had happened approximately 20 minutes prior to the call.

{¶ 10} D.C. identified Morgan as her assailant at trial, albeit with some difficulty due to her eyesight. D.C. testified that her eyesight was in the same condition as it had been during the time of the attack. D.C. also testified that her assailant was tall, heavyset, and light-skinned. On cross-examination, D.C. admitted that she may have been on cocaine on the night she was attacked. D.C. also testified that she did not remember a lot about the incident, and that she thought she had blacked out for two days. D.C. was nevertheless adamant that Morgan had held a gun to her head and forced her to engage in sex acts on the night in question.

{¶ 11} Detective Ronnie Terry was the officer who responded to D.C.'s 911 call.

Terry testified that D.C. reported she had been walking along Clifton Avenue when she was approached by a male who forced her alongside South High School at gunpoint and sexually assaulted her. Terry testified that D.C. described her assailant as a black male of average height and weight in his 30s with short hair, wearing an orange shirt and jeans. Terry testified that D.C. was severely intoxicated when he encountered her. Terry also confirmed that his written reported noted that D.C. could hardly walk without assistance and that she could have possibly been injured by falling.

{¶ 12} With regard to D.C.'s injuries, both D.C. and Detective Terry testified that she was taken to the hospital for treatment on the night of the attack. Photographs of D.C.'s injuries were taken at the hospital and admitted into evidence. The photographs showed that D.C. had a laceration on her nose, dried blood on her face, and abrasions on her right knee and elbow. D.C. also testified that she suffered a broken right arm from Morgan pushing her to the ground, and that she had to recuperate in a nursing home for three months.

{¶ 13} While at the hospital, D.C. was examined by a Sexual Assault Nurse Examiner ("SANE nurse"), Mary Beth Hannon. Hannon testified that she obtained a narrative history from D.C. prior to her examination. Hannon testified that D.C. told her she was walking on Clifton Avenue when she was approached by a tall, heavyset black male with short curly hair who was wearing an orange shirt and jean shorts. D.C. also told Hannon that the man had a gun and made her perform oral sex on him. According to Hannon, D.C. further told her that the man pushed her down, penetrated her vagina with his penis, and hit her in the head with his gun.

{¶ 14} Continuing, Hannon testified that she observed abrasions to D.C.'s nose,

lips, right knee, and left hand and thumb. Hannon also testified that D.C. had right shoulder pain and that the hospital medical records indicated that D.C. had sustained a fractured right shoulder. Hannon further testified that D.C. had abrasions and redness on the opening of her vagina, injuries which Hannon claimed were consistent with the sexual assault described by D.C.

{¶ 15} Hannon additionally testified to performing a rape kit on D.C. In performing the rape kit, Hannon testified that she collected a DNA standard from D.C. by swabbing D.C.'s cheek and gum line. Hannon also testified that she collected vaginal, anal, and oral swabs from D.C. Hannon further testified that she included D.C.'s bra with the rape kit, but that D.C.'s underwear was not included, as D.C. advised her that the underwear had been left at the crime scene. After completing the rape kit, Hannon testified that she released the rape kit to law enforcement. Officer William Evans of the Springfield Police Department testified to collecting the rape kit from Hannon. The parties stipulated that Officer Jeffrey Steinmetz of the Springfield Police Department delivered the rape kit to the Ohio Bureau of Criminal Investigation ("BCI") for testing.

{¶ 16} Sarah Grimsley, a forensic scientist at BCI, also testified at trial. Grimsley testified that she examined D.C.'s rape kit and tested the samples contained therein for the presence of semen. Grimsley testified that her testing revealed that semen was present on D.C.'s vaginal and anal swabs. Grimsley testified that she also discovered one sperm cell on D.C.'s oral swab. After detecting the presence of semen on the swabs, Grimsley testified that she prepared and packaged the swabs for DNA testing by another BCI analyst.

{¶ 17} Hallie Dreyer, another forensic scientist at BCI, was the analyst who

conducted the DNA testing. In conducting her testing, Dreyer testified that she extracted and copied the DNA found on D.C.'s vaginal and anal swabs and then compared that DNA to a known DNA standard from Morgan to see if there was a match. Dreyer testified that she initially conducted a conventional STR DNA test. Dreyer testified that the results of the STR DNA test detected a DNA mixture from D.C. and one male contributor. Dreyer testified that although there were similarities between the male contributor's DNA and Morgan's DNA, the test results were inconclusive as to whether Morgan was the male contributor. Dreyer testified that this is a common outcome due to the abundance of female DNA on vaginal and anal swabs.

{¶ 18} After the conventional STR DNA test results came back inconclusive, Dreyer testified that she performed a Y-STR DNA test on D.C.'s vaginal and anal swabs. Dreyer testified that a Y-STR DNA test is a male-specified DNA test that allows the analyst to ignore any female DNA that is present on the swabs. Dreyer testified that unlike the conventional STR DNA test, the male DNA profile that is obtained from Y-STR DNA testing is not necessarily unique to one male, but rather is unique to any paternal male relative of the male DNA contributor. Dreyer testified that the results of the Y-STR DNA test in this case revealed that there was only one male DNA contributor and that Morgan was included as a contributor. That is to say, the Y-STR DNA testing revealed that Morgan's DNA (and the DNA of his paternal male relatives) matched the male DNA profile that was found in D.C.'s vagina and anus.

{¶ 19} Detective Sandy Fent, the investigating detective assigned to this case, also testified at trial. Fent testified that on March 2, 2016, a photograph lineup was administered to D.C. during which D.C. identified Morgan as her assailant. The

photograph lineup was created by Fent and administered by Detective Trent King. King, a juvenile detective, testified to having no knowledge about D.C.'s case at the time he administered the lineup to D.C. Video evidence of King administering the lineup to D.C. was admitted by the defense and played at trial. The video shows that D.C. initially indicated to King that the individual in photograph #6 (not Morgan) had hair like her assailant. However, after that, D.C. also said that the individual in photograph #4 (Morgan) looked like her assailant too. King then attempted to confirm whether D.C. had chosen photograph #4. Shortly thereafter, D.C. chose photograph #4, Morgan's picture. After D.C. chose Morgan's picture, she asked King if she had picked the right person, to which King responded he did not know. Then, when Detective Fent reentered the room, D.C. told Fent that she did not know if she picked the right person.

*Trial Testimony and Evidence Related to Assault on C.R.*

{¶ 20} C.R. testified that during the early morning hours of July 13, 2015, she was sitting on the steps of South High School when a black male wearing an orange shirt approached her and offered her $30 to engage in a sexual act with him. C.R. testified that she accepted the offer, and that she and the man thereafter walked to an area near the front of the building. Upon reaching a walled-off, concealed grassy area (*see* State's Exhibit No. 6), C.R. testified that the man put a handgun in her face and asked her "if [she] knew what that was." Trial Trans. p. 263. C.R. testified that she told the man, "[y]es, what do you want me to do?" *Id.* C.R. testified that the man thereafter forced her to perform oral sex on him and to engage in vaginal sex.

{¶ 21} C.R. testified that after being sexually assaulted for what seemed like an

hour, she told the man that she was finished and attempted to walk away. However, C.R. testified that when she started to walk away, the man fired a warning shot with his gun and continued to force her to have sex with him. C.R. testified that when the sex act was finished, the man took her purse and did not pay her.

{¶ 22} C.R. testified that her assailant walked south toward Leffel Lane, and that she went in the opposite direction on Clifton Avenue. When C.R. reached the middle of Clifton Avenue, she began to scream and a gentleman stopped to help her. C.R. testified that the gentleman used his phone to call 911. The recorded 911 call was admitted into evidence and played at trial. On the recording, C.R. and the gentleman can be heard reporting that she was robbed by a black male with a gun wearing an orange t-shirt and shorts. C.R. also reported that the male went south on Clifton Avenue and that he had shot his gun in the air.

{¶ 23} Like D.C.'s case, Detective Terry was the officer who responded to C.R.'s 911 call. Terry testified that he was dispatched to the report of a robbery, but, upon arriving at the scene, he learned that C.R. had been both robbed and sexually assaulted. Terry testified that C.R. described her assailant as a black male in his 30s of average height wearing an orange shirt and jeans. Terry testified that C.R. reported the male forced her at gunpoint to the northeast side of South High School, made her perform oral sex on him, and fired a warning shot.

{¶ 24} Continuing, Terry testified that C.R. directed him to the exact area where the assault had occurred. Once he reached that area, Terry testified that he discovered a shell casing from a gun in the grass. Less than a foot away from the shell casing, Terry testified that there was an area in the ground where the dirt was disturbed. Terry testified

that he used a pocket knife to cut around the area of disturbed dirt and thereafter discovered a nine-millimeter bullet in the ground.

{¶ 25} In addition to the shell casing and bullet, Terry also found various personal items scattered down the sidewalk and grass south of the high school. Those items included a purse, cell phone, eyeglass case, cigarette pack, and make-up. Terry testified that C.R. identified the items as belonging to her and that the items were released to her on the night of the assault. Terry testified that the items were not tested for fingerprints because the ground was wet and the weather was humid. According to Terry, such conditions were not conducive to obtaining prints. Terry also testified that fingerprints could not be taken from items made of fabric, like the purse.

{¶ 26} Terry additionally testified that he and his partner, Officer Bronsord, were crime scene technicians and that they worked together to take pictures of the crime scene and to collect all the evidence. Terry testified that he collected the shell casing and the bullet and made sure they were both properly tagged and placed in a secure locker in the Springfield Police Department's property room.

{¶ 27} Both C.R. and Detective Terry testified that C.R. refused medical treatment after the assault. C.R. and Detective Fent also testified that C.R. could not identify her assailant in a photograph lineup. Fent, the detective assigned to the case, testified that she had no leads on the identity of C.R.'s assailant until she learned about a November 2015 traffic stop on Selma Road involving Morgan.

{¶ 28} State Highway Patrol Trooper Tim Durham testified regarding the traffic stop in question. Durham testified that on November 4, 2015, he initiated a traffic stop on Selma Road due to a vehicle traveling at night without its headlights illuminated. Durham

testified that when he and his partner approached the vehicle, they made observations that provided them with probable cause to search the vehicle. Durham testified that he asked the occupant in the front passenger seat, later identified as Morgan, if there was anything in the vehicle that could hurt him or his partner. According to Durham, Morgan responded that he had a handgun in the glove box. Durham testified that he then immediately removed a handgun and loaded magazine from the vehicle's glove box.

{¶ 29} State Highway Patrol Trooper Josh Eldridge also testified at trial. Eldridge testified that he was ordered to test-fire the handgun found during the traffic stop. In doing so, Eldridge testified that the handgun was operable and that he test-fired the handgun twice. Following the test-fires, Eldridge testified that he collected the two resulting bullets and shell casings and sent them to BCI for testing. Detective Fent testified that she requested BCI to compare the test-fired bullets and shell casings with the bullet and shell casing that were found at the scene of C.R.'s assault.

{¶ 30} Matthew White, a BCI firearm and toolmark examiner, testified that he compared the known test-fired bullets and shell casings from Morgan's handgun (which White identified as a nine-millimeter Luger Hi-Point Model C-9 pistol), with the bullet and shell casing found at the scene of C.R.'s assault. Based on his comparisons, White was able to conclude that the shell casing found at the scene of C.R.'s assault was fired from Morgan's gun. White also concluded that the bullet found at the scene of C.R.'s assault had features that are unique to Morgan's gun. However, White testified that the features on the bullet were not unique enough to conclusively determine whether the bullet was fired from Morgan's gun.

{¶ 31} Detective Fent testified that she obtained a buccal swab from Morgan with

his consent while he was in custody following the November 2015 traffic stop. Fent thereafter provided the buccal swab to BCI for purposes of obtaining a DNA standard. Morgan was arrested after Fent received White's firearm analysis, the Y-STR DNA results back from D.C.'s case, and D.C.'s identification of Morgan in the photograph lineup.

{¶ 32} Once Morgan was arrested, Fent conducted an interview with Morgan. The interview was video recorded and submitted into evidence following some redaction. During this interview, Morgan admitted that the gun found during the traffic stop belonged to him, but denied having any involvement in the assaults of D.C. and C.R. Morgan also advised Fent that he lived at 139 East Euclid Avenue, which Fent testified is only three and a half blocks south from where D.C. and C.R. were sexually assaulted. Fent also testified that Morgan's girlfriend resided on the 1100 block of Clifton Avenue, which Fent testified is only four or five blocks from where D.C. and C.R. were assaulted.

*The Jury's Verdict and Sentencing*

{¶ 33} After presenting the foregoing testimony and evidence, the State rested its case. Once the State rested, Morgan chose not to call any defense witnesses and rested his case as well. The jury then deliberated and found Morgan guilty of all the indicted charges and firearm specifications. At sentencing, the trial court merged the rape and kidnapping counts pertaining to each victim, and the State elected to have Morgan sentenced for the two counts of rape. The trial court also merged the firearm specification that was attached to D.C.'s felonious assault with the firearm specification that was attached to D.C.'s rape.

{¶ 34} Following the mergers, the trial court imposed a mandatory prison term of

ten years for each count of rape. The trial court also imposed a three-year mandatory prison term for each of the two firearm specifications. The trial court ordered the sentences for the firearm specifications to be served prior and consecutive to the sentences for rape. The trial court also sentenced Morgan to four years in prison for felonious assault and ordered that sentence to be served consecutive to the sentences for rape. Therefore, the trial court sentenced Morgan to an aggregate term of 30 years in prison.

{¶ 35} Morgan now appeals from his conviction, raising four assignments of error for review.


## First Assignment of Error

{¶ 36} Under his first assignment of error, Morgan contends that his convictions for the rapes and kidnappings of D.C. and C.R. and the felonious assault of D.C. were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.

{¶ 37} As a preliminary matter, we note that the record indicates Morgan failed to preserve his insufficiency of the evidence argument for appeal in that he did not make a Crim.R. 29 motion for acquittal during his trial. "It is generally accepted in Ohio that if counsel fails to make and renew a Crim.R. 29 motion during a jury trial, the issue of sufficiency is waived on appeal." *State v. Carson*, 2d Dist. Montgomery No. 27566, 2018-Ohio-4352, ¶ 21, citing *State v. Richardson*, 2016-Ohio-8081, 75 N.E.3d 831, ¶ 16 (2d Dist.). *Accord State v. Brock*, 2d Dist. Clark No. 2018-CA-112, 2019-Ohio-3195, ¶ 19. However, despite the absence of a Crim.R. 29 motion, an appellate court may

conduct a plain error review. *State v. Fugate*, 2d Dist. Montgomery No. 25782, 2014-Ohio-415, ¶ 20, citing *State v. Hibbler*, 2d Dist. Clark No. 2001-CA-43, 2002-Ohio-4464, ¶ 23. "Plain error does not exist unless, but for the error, the outcome of the trial would have been different." *Id.*, citing *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 894 (1990). Thus, we will review Morgan's insufficiency of the evidence argument for plain error.

{¶ 38} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 39} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier

of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 40} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*Rape and Kidnapping of D.C. and C.R.*

{¶ 41} As previously noted, Morgan was convicted of two counts of rape in violation of R.C. 2907.02(A)(2). To be convicted under that statute, the State was required to present evidence establishing that Morgan engaged in sexual conduct with another by purposely compelling the other person to submit by force or threat of force. R.C. 2907.02(A)(2). The definition of "sexual conduct" includes "vaginal intercourse between a male and female; anal intercourse," and "fellatio." R.C. 2907.01(A). The definition of "force" is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 42} Morgan was also convicted of two counts of kidnapping in violation of R.C. 2905.01(A)(4). To be convicted under that statute, the State was required to present evidence establishing that Morgan, by force, threat, or deception, restrained another person's liberty with the purpose to engage in sexual activity with the person against their will. R.C. 2905.01(A)(4). "Sexual activity" is defined as "sexual conduct," which, as previously noted, includes vaginal and anal intercourse and fellatio. *See id.*; R.C. 2907.01(A) and (C). To restrain another person's liberty means " 'to limit one's freedom of movement in any fashion for any period of time.' " *State v. Martin*, 10th Dist. Franklin Nos. 02AP33, 02AP34, 2002-Ohio-4769, ¶ 32, quoting *State v. Wingfield*, 8th Dist. Cuyahoga No. 69229, 1996 WL 100847, *3 (Mar. 7, 1996).

{¶ 43} In this case, the record indicates that the trial testimony of both D.C. and C.R. established all the necessary elements to support a conviction for both rape and kidnapping. Each woman testified that, during her assault, Morgan pointed a handgun at her head and forced her to engage in oral and vaginal intercourse with him. D.C. testified that Morgan prevented her from walking away by pointing a gun at her and grabbing her arm. D.C. also testified that Morgan pushed her down to the ground and hit her in the face with his gun prior to sexually assaulting her. Similarly, C.R. testified that Morgan put a handgun in her face prior to sexually assaulting her. C.R. also testified that after being sexually assaulted for what seemed like an hour, she attempted to walk away, but Morgan fired a warning shot with his gun and continued to force her to have sex with him.

{¶ 44} Although the foregoing testimony established all elements of the rape and kidnapping charges at issue, Morgan argues that the State failed to present sufficient

evidence establishing that he was the individual who assaulted D.C. and C.R. With regard to D.C., Morgan argues that her identification of him using the photograph lineup was unreliable because D.C. briefly considered another suspect on the lineup and asked Detective King whether she had picked the right person after she had selected Morgan. Morgan also contends that D.C.'s identification of him on the photograph lineup was unreliable because she told Detective Fent "I don't know if I picked the right person or not." Defense Exhibit A. Morgan further argues that D.C. had a difficult time pointing him out at trial due to her poor eyesight, which D.C. testified was in the same condition during the assault. We find no merit to these claims.

{¶ 45} Regardless of the weaknesses in D.C.'s identification of Morgan as her assailant, the fact remains that the State presented DNA evidence linking Morgan to D.C.'s sexual assault. This included the Y-STR DNA test results that established Morgan as a DNA contributor on D.C.'s vaginal and anal swabs. Although the nature of the Y-STR DNA test also includes the men in Morgan's paternal family line as potential DNA contributors, when considering the Y-STR DNA test results in conjunction with other pieces of circumstantial evidence presented at trial, such as: (1) that Morgan lived within a short walking distance from the scene of the crime; (2) that the assailant traveled on foot before and after the crime; and (3) that D.C. was able to identify Morgan as her assailant in the photograph lineup, there was sufficient circumstantial evidence identifying Morgan as D.C.'s assailant. Although D.C. exhibited some uncertainty about her identification of Morgan after the photograph lineup was administered, Detective Fent testified that, in her experience, D.C.'s concern about whether she picked the right person was a natural concern that is exhibited by victims of crime.

{¶ 46} The State also presented sufficient evidence establishing that Morgan was C.R.'s assailant. Although C.R. could not identify Morgan in a photograph lineup, Morgan was linked to C.R.'s assault through a shell casing that was found at the scene of the crime. The State's firearm expert testified that he analyzed the shell casing and determined that it had been fired from the same gun that was confiscated from Morgan following a traffic stop. We also note that Morgan never disputed his ownership of the gun during the investigation.

{¶ 47} Morgan nevertheless argues that the shell casing evidence was insufficient to identify him as C.R.'s assailant because the bullet found next to the shell casing did not match his gun. This argument greatly mischaracterizes the evidence. The firearm expert testified that there was not enough information or "unique characteristics" on the bullet for him to determine whether it was fired from Morgan's gun. Trial Trans. p. 282. That testimony is patently different from concluding that the bullet did not match Morgan's gun. Although the firearm expert could not conclusively determine whether the bullet had been fired from Morgan's gun, the expert did testify that the bullet had "similar class characteristics" to Morgan's firearm. *Id.* Therefore, while Morgan would like this court to believe otherwise, the evidence presented by the State did not rule out the possibility that the bullet was fired from Morgan's gun.

{¶ 48} Given that: (1) the shell casing found at the scene was positively identified as being fired from Morgan's gun; (2) the bullet found at the scene was located less than one foot away from the shell casing; and (3) no other shell casings or bullets were found at the scene of the crime, we find that it would be fair to assume that the bullet came from the shell casing that was fired from Morgan's gun. When considering the shell casing

evidence, the logical inferences flowing from it, as well as the fact that: (1) Morgan lived within a short walking distance from the scene of the crime; (2) the assailant traveled on foot before and after the crime; and (3) Morgan was alleged to have committed the same type of crime against D.C. two months earlier at the same location and in the same manner, there was sufficient circumstantial evidence to identify Morgan as C.R.'s assailant.

{¶ 49} For the foregoing reasons, when construing the evidence in a light most favorable to the State, we find that Morgan's convictions for the rapes and kidnappings of D.C. and C.R. were supported by sufficient evidence. Accordingly, there was no error, let alone plain error, in that regard.

{¶ 50} We also cannot conclude that Morgan's rape and kidnapping convictions were against the manifest weight of the evidence. Simply because the State relied on circumstantial evidence to prove the rape and kidnapping charges did not render Morgan's convictions against the manifest weight of the evidence. This is because circumstantial evidence carries the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 51} Moreover, although D.C. may have given contradictory testimony at times, it was for the jury to determine what part of her testimony, if any, was credible. In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. In this case, the jury chose to believe the testimony and evidence that supported the State's version of the facts. Therefore, since it is not patently apparent that the jury lost is way in finding Morgan guilty

of raping and kidnapping D.C. and C.R., we will not disturb that finding on appeal.

*Felonious Assault of D.C.*

{¶ 52} Morgan also contends that his conviction for the felonious assault of D.C. was not supported by sufficient evidence and was against the manifest weight of the evidence. Pursuant to R.C. 2903.11(A)(1), a person commits felonious assault when he "knowingly * * * [c]ause[s] serious physical harm to another[.]" R.C. 2903.11(A)(1). The definition of "serious physical harm" includes "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity[.]" R.C. 2901.01(A)(5)(c). "Serious physical harm" also includes "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e).

{¶ 53} As stated previously, D.C. testified that Morgan pushed her to the ground and struck her in the face during the sexual assault. The record indicates that this resulted in injuries to D.C.'s arm, face, and knee. The officer who responded to D.C.'s 911 call, Detective Terry, confirmed that D.C. had a small laceration to her face with dried blood on it and abrasions on her knee and elbow. Terry further testified that D.C. was taken to the hospital where she received medical care and had pictures taken of her injuries. The photographic evidence of D.C.'s injuries show that D.C. had dried blood on her face and a laceration on her nose from where Morgan struck her. *See* State's Exhibit Nos. 22-23. D.C. also had abrasions on her elbow and knee from where she claimed Morgan pushed her to the ground and raped her. *See* State's Exhibit Nos. 24-25.

{¶ 54} Most importantly, D.C. testified that her arm was broken as a result of Morgan pushing her to the ground. The SANE nurse who examined D.C., Mary Beth Hannon, testified that she reviewed D.C.'s hospital record before examining her and that the record indicated D.C. had been diagnosed with a fractured right shoulder. Hannon also testified that the hospital record indicated that D.C. had to undergo a "reduction" to put her shoulder back into place. Trial Trans. p. 239. D.C. testified that as a result of her fractured shoulder, she had to recuperate in a nursing home for three months.

{¶ 55} Morgan claims that the foregoing evidence was insufficient to establish that D.C. suffered serious physical harm, because the State failed to admit D.C.'s medical records into evidence. But, contrary to Morgan's claim, "[s]erious physical harm may be shown by testimony of medical treatment." *State v. Huckabee*, 8th Dist. Cuyahoga No. 67588, 1995 WL 628374, *4 (Oct. 26, 1995). *Accord State v. Grider*, 8th Dist. Cuyahoga No. 68594, 1995 WL 753933, *2-3 (Dec. 20, 1995); *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716 and 11AP-766, 2012-Ohio-2989, ¶ 29-35 (rejecting the defendant's argument that the State failed to establish the victim suffered serious physical harm because it offered no medical evidence to document the victim's injuries or to substantiate that the injuries were serious).

{¶ 56} Several appellate courts in this state have held that testimony from victims regarding their injuries is sufficient to establish serious physical harm. *See, e.g., State v. Higgins*, 9th Dist. Summit No. 26120, 2012-Ohio-5650, ¶ 17 (finding victim's testimony that he sustained a gunshot wound, which caused him to suffer a collapsed lung, broken rib, and nerve damage, that required him to be hospitalized for two weeks was sufficient evidence that he had suffered serious physical harm under R.C. 2901.01(A)(5)(c) and

(e)); *State v. Driesbaugh*, 11th Dist. Portage No. 2002-P-0017, 2003-Ohio-3866, ¶ 47 (finding victim's testimony that the accident in question caused his arms and legs to sporadically go numb, making him unsteady on his feet for 21 months and prevented him from working for approximately 3 months, was sufficient to establish that the victim suffered a temporary substantial incapacity so as to qualify as serious physical harm under R.C. 2901.01(A)(5)(c)); *State v. Scott*, 4th Dist. Washington No. 15CA2, 2015-Ohio-4170, ¶ 3, and 23-24 (finding "substantial testimony from the victim regarding her injuries" was sufficient to establish serious physical harm).

{¶ 57} Based on the foregoing, we find that the testimony from D.C. and Hannon indicating that D.C. suffered from a fractured right shoulder and D.C.'s testimony that she recuperated at a nursing home for three months was sufficient evidence of "serious physical harm" as defined under R.C. 2901.01(A)(5)(c) and (e). This court has in fact held that pushing a victim to the ground causing her to suffer a broken arm constitutes serious physical harm as that term is used in the statute. *State v. Boyd*, 2d Dist. Montgomery No. 11659, 1990 WL 78595, *4 (June 5, 1990). *Accord State v. Brown*, 2d Dist. Montgomery No. 27738, 2018-Ohio-3068, ¶ 30. Therefore, when viewing the evidence in a light most favorable to the State, we find that Morgan's conviction for felonious assault was also supported by sufficient evidence, and that there was no error, let alone plain error, in that regard.

{¶ 58} In challenging the manifest weight of the evidence, Morgan argues that the evidence of the cause of D.C.'s shoulder injury was inconsistent because Detective Terry indicated in his written report that D.C.'s injuries "could potentially have been caused by falling" as a result of being "severely intoxicated." Trial Trans. p. 211-213; Defendant's

Exhibit B. However, whether D.C. fell down due to being intoxicated or due to being pushed by Morgan was for the jury to decide based on the evidence presented at trial. Here, the jury believed D.C.'s testimony that she fell and fractured her shoulder as a result of Morgan pushing her to the ground during the sexual assault. We will not disturb that finding as "[t]he jury, as the trier of fact, is in the best position to make credibility determinations and to draw inferences from the evidence because they observe the witness' demeanor and because they alone actually hear the testimony as it is given." *State v. Wagers*, 12th Dist. Butler No. CA92-11-231, 1993 WL 369240, *1 (Sept. 20, 1993), citing *State v. Thomas*, 70 Ohio St.2d 79, 79-80, 434 N.E.2d 1356 (1982). Therefore, Morgan's felonious assault conviction was not against the manifest weight of the evidence.

{¶ 59} Having found that Morgan's convictions for rape, kidnapping and felonious assault were supported by sufficient evidence and were not against the manifest weight of the evidence, Morgan's first assignment of error lacks merit and is overruled.

**Second Assignment of Error**

{¶ 60} Under his second assignment of error, Morgan contends that he received ineffective assistance of counsel because his trial counsel failed to: (1) object to and move to suppress D.C.'s identification of him at trial; (2) request a mistrial after Detective King testified in a manner that suggested Morgan had a criminal history; and (3) renew his pretrial motion for relief from prejudicial joinder. Morgan's claims lack merit.

*Standard of Review for Ineffective Assistance Claims*

{¶ 61} This court reviews alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which has been adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, in order to prevail on an ineffective assistance claim, Morgan must show that his trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 62} To establish deficient performance, Morgan must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson,* 2d Dist. Champaign No. 2004-CA-24, 2005-Ohio-6143, ¶ 29, citing *Strickland.* "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992), citing *Strickland* at 687-689. "[A] debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 37 (2d Dist.), citing *Strickland* at 689. (Other citation omitted.)

{¶ 63} To establish prejudice, Morgan must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688, 694; *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

*Failure to Object/Move to Suppress D.C.'s Identification of Morgan*

**{¶ 64}** Morgan first contends that his trial counsel provided ineffective assistance by not filing a motion to suppress D.C.'s testimony identifying him as her assailant. Morgan claims that a motion to suppress should have been filed because of how the photograph lineup was administered to D.C. and because of the uncertainty that D.C. exhibited after she chose Morgan's picture on the lineup. Morgan also claims that his trial counsel was ineffective in failing to object to the admissibility of D.C.'s in-court identification of him at trial. We disagree.

**{¶ 65}** As a preliminary matter, we note that the " 'failure to file a suppression motion does not constitute per se ineffective assistance of counsel.' " *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). *Accord State v. Black*, 2d Dist. Montgomery Nos. 26986, 26991, 2016-Ohio-7901, ¶ 26. "Where the basis of an ineffective assistance of counsel claim is counsel's failure to file a motion to suppress evidence, the defendant making that claim must prove that the basis of the suggested suppression claim is meritorious." *In re D.D.*, 2d Dist. Montgomery No. 22740, 2009-Ohio-808, ¶ 3, citing *Kimmelman* and *State v. Pillow*, 2d Dist. Greene No. 07CA095, 2008-

Ohio-6046.

**{¶ 66}** "Due process may require a court to suppress eyewitness testimony when the identification results from an unduly suggestive identification procedure." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208, citing *Foster v. California*, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Therefore, "[a]n accused who seeks to preclude in-court identification testimony bears the burden of convincing the court that the out-of-court identification procedure employed was both suggestive and unnecessary and that the testimony will be unreliable under the totality of the circumstances." *State v. Allen*, 1st Dist. Hamilton Nos. C-870437, C-870475, 1988 WL 92639, *1 (Sept. 7, 1988), citing *Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). (Other citation omitted.)

**{¶ 67}** "[N]o due process violation will be found where an identification does not stem from an impermissibly suggestive confrontation, but is instead the result of observations at the time of the crime." *State v. Davis*, 76 Ohio St.3d 107, 112, 666 N.E.2d 1099 (1996); *Coleman v. Alabama*, 399 U.S. 1, 5-6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." *Adams* at ¶ 208, citing *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir.2001); *see also Jells v. Mitchell*, 538 F.3d 478, 511-512 (6th Cir.2008) (a lineup was found unduly suggestive where the defendant was depicted in a prison jumpsuit and the other participants in the lineup were in street clothes).

**{¶ 68}** In this case, Morgan conceded in his appellate brief that it is "questionable" whether the photograph lineup was administered to D.C. in a suggestive manner.

Indeed, the video evidence of Detective King administering the photograph lineup to D.C. establishes that King merely confirmed whether or not D.C. chose photograph #4 (Morgan). Therefore, we find nothing in the video demonstrating that King improperly steered D.C. to pick Morgan's photograph.

{¶ 69} Despite this, Morgan argues that D.C.'s identification of him was unreliable because D.C. thought the individual shown in photograph #6 also looked like her assailant. Morgan further claims that D.C.'s identification of him was unreliable because, after picking Morgan's photograph, D.C. asked if she had picked the right person and exhibited uncertainty as to whether she had picked the right person. However, the fact remains that D.C. chose the photograph of Morgan without the presence of any unduly suggestive tactics. That D.C. may have had concerns about whether she picked the right person afterwards goes to the weight and credibility of her identification of Morgan, not to its admissibility.

{¶ 70} Because D.C.'s identification of Morgan did not stem from an impermissibly suggestive confrontation procedure, but was instead based on D.C.'s memory of her assailant's appearance, Morgan's trial counsel may have reasonably concluded that it would have been futile to file a motion to suppress D.C.'s identification testimony. Such a decision is a matter of trial strategy that cannot form the basis of an ineffective assistance claim. Also, while the record indicates that D.C. had some difficulty pointing out Morgan in the courtroom, D.C. was eventually able to point him out and identify him as her assailant. Trial counsel's failure to object to D.C.'s arduous in-court identification was also a matter of trial strategy.

{¶ 71} That said, even if we had found that trial counsel rendered deficient

performance by not filing a motion to suppress or by not objecting to D.C.'s in-court identification, Morgan cannot establish that the outcome of his trial would have been different but for those failures. Even without D.C.'s identification, Morgan's identity was otherwise established through the Y-STR DNA test results and other circumstantial evidence, including the fact that Morgan lived within a short walking distance from the scene of the crime scene and that D.C.'s assailant traveled on foot. Therefore, Morgan cannot establish that he was prejudiced by his trial counsel's failures. Given that Morgan failed to establish deficient performance on the part of his trial counsel and resulting prejudice, his ineffective assistance claim lacks merit.

*Failure to Request a Mistrial*

{¶ 72} Morgan also argues that his trial counsel provided ineffective assistance by failing to request a mistrial after Detective King testified in a manner that improperly suggested Morgan had a criminal history. Specifically, Morgan takes issue with the portion of King's testimony explaining how photograph lineups are generated. King testified that photograph lineups are generated from "OLEG, the Ohio Law Enforcement Gateway, driver's license photos, or six different photos from the City of Springfield's jail photo database." Trial Trans. p. 131-132. King also testified that the photograph lineup administered to D.C. was generated using "the Clark County Sheriff's Department, Springfield Police Division photo logs." *Id.* at 134-135. Morgan asserts that this testimony suggested to the jury that the photographs used in the lineup depicted individuals with criminal histories. According to Morgan, this deprived him of a fair trial. We disagree.

{¶ 73} "When a reference to a defendant's prior record does not rise to the level of plain error meriting the trial court to sua sponte declare a mistrial, then 'there is no basis to claim that [defendant's] trial counsel acted ineffectively in failing to seek a mistrial.' " *State v. Howard*, 2d Dist. Montgomery No. 18884, 2002 WL 1332522, *4 (June 14, 2002), quoting *State v. Jones*, 115 Ohio App.3d 204, 208, 684 N.E.2d 1304 (7th Dist.1996). "Plain error exists 'if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings.' " *State v. Kessel*, 2019-Ohio-1381, ___ N.E.3d ___, ¶ 33 (2d Dist.), quoting *State v. Bahns*, 185 Ohio App.3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, ¶ 25 (2d Dist.). (Other citation omitted.)

{¶ 74} Although improper, we cannot say that Detective King's indirect, general reference to Morgan's prior criminal history affected the outcome of trial. Even if the statement had not been made, the record indicates that there was an abundance of direct and circumstantial evidence establishing that Morgan was the individual who attacked D.C. and C.R., the strongest being the Y-STR DNA test results linking Morgan to the assault on D.C. and the firearm analysis linking Morgan to the assault on C.R. Therefore, because King's statement did not result in prejudice to Morgan, trial counsel was not ineffective in failing to request a mistrial.

*Failure to Renew Motion for Relief from Prejudicial Joinder*

{¶ 75} For his last ineffective assistance claim, Morgan contends that his trial counsel was ineffective in failing to renew his motion for relief from prejudicial joinder at any time during trial. We again disagree.

{¶ 76} Crim.R. 8(A) governs the joinder of offenses and provides that: "Two or

more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶ 77} "The law favors joinder to prevent successive trials, to minimize the possibility of incongruous results in successive trials before different juries, to conserve judicial resources, and to diminish the inconvenience to witnesses." *State v. Broadnax*, 2d Dist. Montgomery No. 21844, 2007-Ohio-6584, ¶ 33, citing *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992) and *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). *Accord State v. Goodner*, 195 Ohio App.3d 636, 2011-Ohio-5018, 961 N.E.2d 254, ¶ 39 (2d Dist.). In *Broadnax*, this court held that a joinder was appropriate under Crim.R. 8(A) where "all of the offenses at issue were of the same or similar character, being aggravated robberies, all were committed within a six day period * * * [a]ll of the offenses involved a similar modus operandi and were committed the same way, and all of the offenses involved a common scheme, plan or course of criminal conduct." *Broadnax* at ¶ 34. *See also State v. Ward*, 2d Dist. Montgomery No. 26773, 2016-Ohio-5354, ¶ 15 (joinder appropriate under Crim.R. 8(A) where two aggravated robberies were committed at the same location in a virtually identical manner on consecutive days).

{¶ 78} However, "[e]ven if offenses are properly joined pursuant to Crim.R. 8(A), a defendant may move to sever the charges pursuant to Crim.R. 14." *Broadnax* at ¶ 37. Crim.R. 14, requires the trial court to order separate trials "[i]f it appears that a defendant

* * * is prejudiced by a joinder of offenses[.]" Joinder may be prejudicial "when the offenses are unrelated and the evidence as to each is very weak, * * * but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense[.]" (Citations omitted.) *Torres* at 343-344. "The mere possibility that the defendant might have a better choice of trial tactics if the counts are separated, or the mere possibility that he might desire to testify on one count and not on the other, is insubstantial and speculative; it is not sufficient to show prejudice." (Citation omitted.) *Id.* at 344.

{¶ 79} "One of the ways in which the State can negate a defendant's claim of prejudice is by showing that the evidence pertaining to each crime joined at trial is simple and direct[.]" (Citations omitted.) *Broadnax* at ¶ 38. *Accord State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 30. "Evidence is 'simple and direct' if the jury is capable of readily separating the proof required for each offense, if the evidence is unlikely to confuse jurors, if the evidence is straightforward, and if there is little danger that the jury would 'improperly consider testimony on one offense as corroborative of the other.' " *State v. Freeland*, 4th Dist. Ross No. 12CA003352, 2015-Ohio-3410, ¶ 14, quoting *State v. Varney*, 4th Dist. Hocking Nos. 07CA18, 07AP18, 2008-Ohio-5283, ¶ 19; *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 34; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 50-51. Therefore, "a defendant does not suffer prejudice from joinder of offenses when the offenses charged in an indictment are 'simple and distinct,' when '[t]he factual situation of each crime was easy to understand and was capable of segregation,['] and when '[t]he crimes involved different victims, different factual situations, and different witnesses.' "

*Freeland* at ¶ 14, quoting *State v. Clifford*, 135 Ohio App.3d 207, 212, 733 N.E.2d 621 (1st Dist.1999).

{¶ 80} The State can also rebut a defendant's claim of prejudicial joinder by satisfying the "other acts" test. *LaMar* at ¶ 50. That is, "[i]f in separate trials the state could introduce evidence of the joined offenses as 'other acts' under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder." *Id.*, citing *State v. Coley*, 93 Ohio St.3d 253, 259-260, 754 N.E.2d 1129 (2001). Pursuant to Evid.R. 404(B), evidence of other bad acts is admissible for "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." For other-acts evidence to be admissible to prove identity through a certain modus operandi, the " 'other-acts evidence must be related to and share common features with the crime in question.' " *Coley* at 260, quoting *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616, paragraph one of the syllabus. (Other citation omitted.)

{¶ 81} As previously noted, Morgan filed a Crim.R. 14 motion for relief from prejudicial joinder that requested the trial court to sever the rape, kidnapping, and felonious assault charges related to D.C. from the rape and kidnapping charges related to C.R. Morgan alleged that the joinder of those offenses prejudiced him because there was a risk that the jury would use the evidence in one case to bolster the allegations in the other case. The trial court overruled the motion and Morgan's trial counsel failed to renew it at any time during Morgan's jury trial.

{¶ 82} Morgan now claims that his trial counsel's failure to renew the motion for relief from prejudicial joinder amounted to ineffective assistance. However, we find that the joinder of the offenses against Morgan was appropriate under Crim.R. 8(A) and that

there was no prejudice warranting a severance under Crim.R. 14. This is because the evidence relating to the offenses against D.C. and C.R. was simple, direct, and capable of separation. The factual situation of each incident was also easy to understand, as each incident involved separate victims and separate physical evidence. Furthermore, even if the offenses in question had been severed, given the common modus operandi in each case, the evidence from one case would have otherwise been admissible in the other case as other-acts evidence under Evid.R. 404(B) to prove Morgan's identity.

{¶ 83} For the foregoing reasons, even if Morgan's trial counsel had renewed the motion for relief from prejudicial joinder at trial, it is unlikely the trial court would have changed its mind and granted the motion. Any claim otherwise is pure speculation. Accordingly, because Morgan's claim is supported by, at best, pure speculation, Morgan cannot establish that he was prejudiced by counsel's failure to renew the motion.

{¶ 84} Having found no merit to any of the ineffective assistance claims raised by Morgan, his second assignment of error is overruled.


**Third Assignment of Error**

{¶ 85} Under his third assignment of error, Morgan claims that he was denied the right to a fair trial due to pre-indictment delay. In support of this claim, Morgan contends that the nine-month delay between the May 25, 2015 attack on D.C. and his March 14, 2016 indictment prejudiced him because it allowed D.C.'s memory of her assailant to fade, thus hindering her ability to identify him. Morgan claims that he was further prejudiced by the delay because it resulted in missing evidence. We again find no merit to Morgan's claims.

**{¶ 86}** It is well established that "[d]elay between a defendant's involvement in alleged criminal conduct and an indictment involving such conduct may deprive a defendant of his constitutionally protected due process rights." *State v. Moore*, 2017-Ohio-1307, 88 N.E.3d 593, ¶ 24 (2d Dist.), citing *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus. However, "preindictment delay violates due process only when it is unjustifiable and causes actual prejudice[.]" *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 12. Therefore, "[w]hen a defendant alleges that he has been prejudiced by the State's pre-indictment delay in pursuing a case, the defendant must first produce evidence demonstrating that the delay has caused actual prejudice to his defense." *State v. Shoopman*, 2d Dist. Montgomery No. 27182, 2017-Ohio-2612, ¶ 8, citing *Luck* at 157-158. "Then, if the defendant has established actual prejudice, the State must produce evidence of a justifiable reason for the delay." *Id.*, citing *Luck* at 158.

**{¶ 87}** "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones* at ¶ 28, citing *Luck* at 157-158. "A determination of actual prejudice involves ' "a delicate judgment" ' and a case-by-case consideration of the particular circumstances." *Id.* at ¶ 20, quoting *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). "A reviewing court must scrutinize a defendant's claim of prejudice in light of the particular evidence that was lost or is unavailable as a result of the delay and, in particular, consider the effect of the lost evidence on the defense[.]" *Shoopman* at ¶ 9, citing *Jones* at ¶ 23.

{¶ 88} "General assertions that memories have faded are not sufficient to satisfy a defendant's burden to demonstrate that he suffered specific, actual prejudice." (Citations omitted.) *State v. Conley*, 2d Dist. Clark No. 01-CA-0013, 2001 WL 958834, *2 (Aug. 24, 2001). *Accord Shoopman* at ¶ 9; *Jones* at ¶ 21, 27. *See also Miamisburg v. Rinderle*, 2d Dist. Montgomery No. 26094, 2015-Ohio-351, ¶ 17 (holding the defendant's broad assertion of fading memories, although potentially true, was not sufficient to establish actual prejudice because the defendant did not identify any particular memory at issue or explain how the fading memories prejudiced him). "That does not mean, however, that demonstrably faded memories * * * cannot satisfy the actual-prejudice requirement." *Jones* at ¶ 21.

{¶ 89} In this case, Morgan's general assertion that the pre-indictment delay allowed D.C.'s memory of her assailant to fade is insufficient to establish actual prejudice. Moreover, even if D.C.'s memory had been compromised by the nine-month pre-indictment delay, Morgan's identity was otherwise established through the Y-STR DNA test results and other circumstantial evidence, i.e., the fact that Morgan lived within a short walking distance from the scene of the crime and that D.C.'s assailant traveled on foot. Therefore, regardless of D.C.'s memory, the State's evidence sufficiently identified Morgan as her assailant. Accordingly, we cannot say that D.C.'s possibly faded memory of her assailant resulted in actual prejudice to Morgan.

{¶ 90} Morgan also asserts that the pre-indictment delay resulted in missing evidence, including D.C.'s underwear. The record indicates that D.C.'s underwear was not included with the rape kit that was sent to BCI for testing and that D.C. advised the SANE nurse that her underwear was left at the crime scene. Detective Fent testified that

she had no knowledge of the underwear until it was discussed at trial. Regardless, Morgan does not explain how D.C.'s underwear was relevant to his defense, and we fail to see how the pre-indictment delay caused the underwear not to be collected and tested. If anything, locating and testing the underwear would have prolonged the investigation and created further pre-indictment delay.

{¶ 91} Morgan further claims that the pre-indictment delay prejudiced him because it resulted in certain pieces of physical evidence related to C.R.'s assault not being collected and tested. Specifically, Morgan asserts that the shell casing and bullet found at the crime scene and C.R.'s personal belongings that were dropped by the assailant should have been, but were not tested for fingerprints. Morgan claims that the missing fingerprint evidence could possibly have exonerated him. The record, however, indicates that it was not the pre-indictment delay which prevented the fingerprint evidence from being collected. Rather, Detective Terry indicated that he did not dust the aforementioned items for fingerprints because of the weather. Specifically, Terry testified that, on the night of C.R.'s assault, the ground was wet and it was "very humid" and "moist" outside. Trial Trans. p. 203 and 206. Based on the weather conditions, Terry testified that the fingerprint powder would have just stuck to the moisture and "made a mess." *Id.* at 206. Terry also testified that items made of fabric, such as C.R.'s purse, cannot be fingerprinted. Therefore, C.R.'s claim that the pre-indictment delay resulted in missing fingerprint evidence lacks merit.

{¶ 92} Morgan additionally claims that he was prejudiced because his gun was not sent to the firearm expert for testing. We again fail to see how this was caused by the pre-indictment delay or how it resulted in actual prejudice to Morgan. With or without the

gun, the firearm expert was able to compare the shell casing and bullet found at the scene of the crime with shell casings and bullets that were test-fired from Morgan's gun. In doing so, the firearm expert concluded that the shell casing found at the scene was fired from Morgan's gun and that the bullet had "similar class characteristics" to Morgan's gun. Trial Trans. p. 282. Sending the gun itself to the firearm expert would not have minimized this evidence or bolstered the defense. If anything, it would have prolonged the investigation and would have created greater pre-indictment delay.

{¶ 93} We further note that the pre-indictment delay was less than a year and was simply due to the pending investigation. The record indicates that the delay was not used to gain a tactical advantage or due to any negligence or error on the part of the investigating officers. *See State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 98. During the investigation, the officers and detectives compiled evidence, sent evidence to BCI for testing, and located and interviewed witnesses. The record indicates that Morgan's gun, a key piece of evidence linking Morgan to C.R.'s assault, was not discovered until he was pulled over in a traffic stop several months later in November 2015. Since the firearm expert needed test-fired shell casings and bullets from that gun in order to conduct his analysis, the earliest the firearm expert could have begun his testing was November 2015, and the record indicates that the firearm expert's testing was completed on March 4, 2016. In addition, the Y-STR DNA testing in D.C.'s case could not be performed until a buccal swab was obtained from Morgan after he was placed in custody. Even then, once the buccal swab was obtained, the Y-STR DNA testing was not completed until January 8, 2016. Furthermore, D.C., a known transient, could not be located for an interview with Detective Fent until March 2, 2016. Therefore,

Morgan not only failed to establish actual prejudice flowing from the pre-indictment delay, but the record indicates that the pre-indictment delay was justifiable in that it was simply a result of the pending investigation.

{¶ 94} For the foregoing reasons, Morgan's Third Assignment of Error is overruled.


**Fourth Assignment of Error**

{¶ 95} Under his fourth assignment of error, Morgan contends that the trial court erred in granting a trial continuance so that the State could locate D.C. We once again disagree with Morgan's claim.

{¶ 96} "The trial court has broad discretion to grant or deny a motion for a continuance." *State v. Danon*, 2018-Ohio-419, 105 N.E.3d 596, ¶ 28 (2d Dist.), citing *State v. Bones*, 2d Dist. Montgomery No. 26017, 2015-Ohio-784, ¶ 61. Therefore, an appellate court must not reverse a trial court's decision on a motion for continuance absent an abuse of discretion. *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 97} Whether the trial court abused its discretion by granting or denying a

requested continuance depends upon the reasons offered for the requested continuance. *State v. Blair*, 171 Ohio App.3d 702, 2007-Ohio-2417, 872 N.E.2d 986, ¶ 11 (2d Dist.). In exercising its discretion to grant or deny a motion for continuance, a trial court should consider " 'the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which [gave] rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.' " *State v. Bocock*, 2d Dist. Montgomery No. 22481, 2008-Ohio-5641, ¶ 23, quoting *State v. Maxwell*, 2d Dist. Montgomery No. 13966, 1993 WL 393835, *7 (Oct. 7, 1993). "It is within the trial court's discretion to decide which of the above factors is to be given the most weight." (Citation omitted.) *State v. Parker*, 2d Dist. Montgomery No. 18926, 2002-Ohio-3920, ¶ 16.

{¶ 98} In this case, trial was originally scheduled for July 24, 2018. D.C., however, did not appear. The day before trial, the State offered to dismiss the rape, kidnapping, and felonious assault charges related to D.C. if Morgan agreed to plead guilty to the rape and kidnapping charges related to C.R. Morgan, however, declined the State's plea offer and insisted on going to trial. As a result, the State moved the trial court for a continuance on the day of trial so that D.C. could be located. In doing so, the State advised the trial court that, for the past month, it had attempted to contact and serve D.C. with a subpoena, but was ultimately unsuccessful due to her transient nature. The Stated also advised the trial court that it had requested location assistance from the Springfield Police Intelligence Unit and the Sherriff's Office. The State further indicated

that an officer had provided it with information about D.C.'s location, but that service on D.C. was unsuccessful at that address. The record indicates that the State also attempted to contact D.C. by phone, which proved unsuccessful. The State, nevertheless, advised the trial court that D.C. had recently been sighted and that officers were currently looking for her.

{¶ 99} Although taking into consideration the last-minute nature of the State's request for a continuance, the trial court granted the State a short, three-week trial continuance. Given D.C.'s transient nature, the State's earnest attempts to locate D.C., and Morgan's decision to move forward with trial, we do not find that the trial court's decision to grant a continuance was unreasonable. The length of the continuance was short so as to minimize the inconvenience to the litigants, the trial witnesses, and counsel. In addition, the continuance was requested for a legitimate reason, as the State made earnest attempts to locate D.C. well before the trial date and could be faulted for her transient nature. Therefore, we do not find that the trial court's decision to grant the trial continuance was an abuse of discretion.

## Conclusion

{¶ 100} Having overruled all four assignments of error raised by Morgan, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies sent to:

John M. Lintz
Kimberly Melchor
Hon. Richard J. O'Neill