[Cite as *State v. Miller*, 2021-Ohio-1878.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellant, | : | No. 109543 |
| v. | : | |
| MATTHEW MILLER, | : | |
| Defendant-Appellee. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** June 3, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-642061-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Oscar Albores, Daniel T. Van, and Tasha L.
Forchione, Assistant Prosecuting Attorneys, *for
appellant.*

Cullen Sweeney, Cuyahoga County Public Defender, and
Aaron T. Baker, Assistant Public Defender, *for appellee.*

LISA B. FORBES, J.:

{¶ 1} The state of Ohio appeals from the trial court's granting defendant Matthew Miller's ("Miller") motion to dismiss for preindictment delay. After reviewing the facts of the case and pertinent law, we reverse the trial court's decision.

## I.     Facts and Procedural History

{¶ 2} This case stems from an alleged incident that occurred on April 4, 2002. A.N., who was 14 years old at the time, alleged that Miller raped her in a van on the west side of Cleveland. A.N.'s mother called 911 that day to report her daughter missing. The police responded to the 911 call and found A.N. walking in the neighborhood. A.N. told the police about the incident, and a rape kit was administered that same day. However, this rape kit was not processed until 2014, and on April 28, 2016, a CODIS hit made a preliminary association between DNA found in A.N.'s rape kit and Miller's DNA.

{¶ 3} On July 18, 2019, Miller was indicted for rape in violation of R.C. 2907.02(A)(2), a first-degree felony, and unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), a fourth-degree felony. The rape charge against Miller included notice of prior conviction and repeat violent offender specifications.

{¶ 4} On August 13, 2019, the Ohio Bureau of Criminal Investigation ("BCI") issued a report to the Cleveland Police Department detailing the findings from A.N.'s rape kit. DNA from sperm found on A.N.'s underwear, vaginal swab, and anal swab matched Miller's DNA with "the estimated frequency of occurrence [of] rarer than 1 in 1 trillion."

**{¶ 5}** On December 18, 2019, and December 19, 2019, the court held a hearing on Miller's motion to dismiss for preindictment delay. On January 27, 2020, the trial court summarily granted Miller's motion to dismiss, and it is from this dismissal that the state appeals.

## II. Hearing Testimony and Evidence

**{¶ 6}** Sam Eadeh ("Eadeh"), the first witness to testify, stated that, in 2002, he owned a blue Dodge caravan and he worked at a deli on the west side of Cleveland. Eadeh did not recall the van's license plate number, although he testified that he remembered the digits "5" and "7." Asked about the license plate number "BT57AV," Eadeh answered that it "rings a bell." Eadeh testified that he was the only person who drove this van and he never lent it to anybody. The police did not ask him anything about this van in 2002 or any other time. According to Eadeh, someone from the public defender's office contacted him in September 2019 about the van. Eadeh testified that he did not recognize Miller and was unable to identify anyone from the photo lineup that the person from the public defender's office showed him.

**{¶ 7}** Joseph Libretti ("Libretti") testified that he is an investigator for the Cuyahoga County Public Defender's Office. He was assigned Miller's case in September 2019. As part of his investigation, Libretti interviewed Miller, Miller's sister Kimberly, Eadeh, and former Cleveland Police Officer Dion Sorrells ("Sorrells").

**{¶ 8}** In interviewing Miller, Libretti learned that Miller thought his sister Ashley would be important to his case. Ashley would allegedly testify that Miller

met A.N. "on at least one occasion and possibly two" prior to the victim's allegations that Miller raped her. Libretti was unable to locate Ashley, although he testified that "[w]e believe that she is somewhere in the State of Tennessee." Libretti ran a report from a "commercial database that we use to locate people." From this report, Libretti called "seven or eight phone numbers" associated with the name "Ashley Miller" and sent one letter to an address in Tennessee. Libretti testified that he mailed this letter on the Friday before the hearing, and "[s]he's probably going to get it today or tomorrow." Libretti did not know whether Ashley "resides at that address."

{¶ 9} Libretti testified that he also interviewed Miller's sister Kimberly in an attempt to locate Ashley, although the attempt was unsuccessful.

{¶ 10} Libretti testified that Miller's mother passed away in 2004. According to Libretti, Miller's mother would also have allegedly testified that "Miller and the alleged victim on two occasions had socialized on the mother's front porch of her home * * *."

{¶ 11} Libretti testified that he had a phone conversation with Sorrells, who was the responding police officer regarding the 911 call in 2002. Sorrells authored a police report about the alleged rape on the day of the incident. Sorrells is no longer on the police force, because "he suffered a stroke 15-years ago, and he also has cancer. He is unable to read or write." Asked if he remembered "a case from 2002 where he was the responding officer and a 14-year old * * * reported having been raped in a van," Sorrells replied that he "had absolutely no memory of the case."

{¶ 12} Libretti testified about a written report A.N. made to the police on April 23, 2002. In this statement, A.N. refers to the man who raped her as "Mike" and told police that she has seen him "about five or six times" prior to the incident at issue in this case. Libretti testified that he knew Miller's first name was not "Mike."

{¶ 13} Kimberly Miller-Withrow testified that she is Miller's sister, and they have a younger sister named Ashley. Miller and Ashley were living with their mother on the west side of Cleveland in 2002. Kimberly also lived in the area at the time. Kimberly last saw Ashley on December 24, 2012, and she last spoke with Ashley on the phone in 2015 or 2016. Kimberly has had custody of Ashley's oldest child since the child was nine months old. Kimberly testified that she believes Ashley lives in Tennessee, but she and other family members have not been able to locate Ashley since 2013.

{¶ 14} At the hearing on Miller's motion to dismiss, the parties introduced the following pertinent evidence into the record: (1) the April 4, 2002 Cleveland Division of Police Field Report authored by Sorrells; (2) the April 23, 2002 written statement of A.N. to the Cleveland Police; and (3) the May 10, 2019 report detailing the cold case interview with A.N.

- **April 4, 2002 Police Field Report**

{¶ 15} On April 4, 2002, Sorrells filled out a field report listing A.N. as the victim and "Mike" as the offender. The noted offenses were kidnapping and rape, and the suspect's vehicle was listed as a gray minivan. This report stated that A.N.

was taken to MetroHealth where a "sexual assault kit" was performed.  In the report,

Sorrells wrote the following narrative:

> On above date, at [A.N.'s] address, I responded to a [missing person juvenile] call.  Upon my arrival I met [the caller] who stated that her daughter [A.N.] was not at home, and that this was very unusual.  After getting [A.N.'s] information, I drove S/B on W. 90 where I saw [A.N.] walking N/B.  I asked her if she was alright, and she stated "No, I just got raped."  I called for EMS, and [A.N.] was taken to the hospital.
>
> An interview at the hospital revealed that [A.N.] was on her way home from a friend's house * * *, when she was approached by the suspect vehicle traveling N/B on W. 100 from Walford.  [A.N.] states the driver kept trying to talk to her but she kept walking, ignoring him.
>
> [A.N.] then states the driver pulled the vehicle over, got out, grabbed her by her coat sleeve, and pulled her into the vehicle (through the passenger door).  [A.N.] then states that the driver took her to a field/park[ing] lot in the area of W. 100 [and] Linnet and parked in the rear. [A.N.] states at this time suspect removed her coat & top, fondled her breasts, then removed her shoes, jeans, and panties.  [A.N.] states she was crying a lot, and the suspect covered her mouth with his hand, and stated if you don't stop crying I'm gonna pull out my pistol.  At this time, she states the suspect pulled down his pants, got on top of her, and penetrated her vagina with his penis.  Victim states the suspect moved in and out a couple of times, then got up, put his pants on, and told her to put her clothes back on.  At this time she was released from the vehicle and told not to take it personally.
>
> [A.N.] was taken to the hospital, a rape kit was completed, and she was released.

- **April 23, 2002 A.N. Written Statement**

{¶ 16} On April 23, 2002, A.N. gave a written statement to Detective Harold

Thomas of the Cleveland Police Department, which states verbatim as follows:

Q: Who is Mike?

A: A guy me and my friend Brandy had met at Sunrise Park.

Q: Can you describe Mike?

A:  He is about 5'6" or 5'7", he has short brown hair, Brn eyes, Small face, mustache and goatee, about 190lbs, 20yrs old, white male, his [sic] kinda chubby.

Q:  How many times had you seen Mike before the incident that occurred on April 4, 2002?

A:  About five or six times.

* * *

Q:  Do you know where Mike lives, or his last name?

A:  I know he lives on Loretta Ave, and no I don't know his last name. He said that he has a sister, he told me this the night that it happened.

Q:  What happened between you and Mike on April 4, 2002?

A:  I was walking down to Thrush Park, to see if my boyfriend was up there.  * * * It was between 3:00 and 4:00 p.m.  I had left home to go to the park.  I was walking down W.90th and Almira, I went straight down until I got to 99th and Loretta.  I seen Mike, and we started talking.  We walked down to Sunrise Park.  I asked him if he had an extra cigarette. He said no, he asked me, did I want a pack of cigarettes.  We walked back up to W. 99th and Loretta to [the] store.  I waited on the side of the store while he got the cigarettes.  Then we were walking down the street, after he had bought the cigarettes, then he asked me if I wanted to go for a ride with him.  I said, yeah.  He told me to wait for him past the store a little bit, on Loretta.  He went down the street to get his van. I did not see him get into the van, but I did see when he turned on the lights and started the van up.  I was looking through the back yard from Loretta.  It was about the third house down.  Then he picked me up on Loretta.  He was driving a bluish gray colored van, with dark windows, he had metal bars on top of the van, it had a sliding door on the passenger side.  * * * He pulled up and I crossed the street and got into the van. * * * While we were in the van driving, Mike said that he wanted to see my chest.  I told him no.  When we [parked] behind [a] building, he pulled my shirt and bra up and started grabbing on my left breast.  I pulled my shirt back down, he started to unzip my pants, he told me to get into the back, he took off my jacket, my shirt my bra, my pants and underwear.  He took off his pants a little, he pulled them down to his knees.  He got on top of me put his penis inside of my vaginal area.  I started to move, trying to get him off of me and crying.  He told me if I didn't stop moving and crying he was going to get his pistol.  He put his

hand over my mouth, he was on top of me not a long time. Then he got off of me, he pulled his pants back up, he told me to get back dressed. I did get dressed. He told me that he was messing with me, and he had a little sister and he wouldn't want anybody to do that to his sister. I said to him, that he scared the shit out of me. He started up the van, pulled out of the driveway, and dropped me off at W. 91st and Almira. I got out of the van, lit up a cigarette, until I got to the middle of W. 90th the police pulled up and said there you are. He put me in the cop car and asked me what happened and I told him what happened and my dad/my mom's boyfriend * * * pulled up in front of us. He started yelling at me and the cop pulled him to side and told him what happened. Then [my mom's boyfriend] had called my mom, and told her they found me. My mom came down the street from the Denison side of W. 90th. The cop called the ambulance and they took me to Metro hospital.

Q: When you got into the van with Mike, did he say where you were going?

A: No.

Q: What were you doing while Mike was taking off your clothes?

A: I was crying, I pushed him with my hand, and he pushed my arm back.

Q: Did you ever see his pistol?

A: No.

Q: Where in the van did you have sex?

A: It was on the seat behind us.

Q: Do you know if Mike ejaculated?

A: No I don't know.

Q: Do you know if Mike used a condom?

A: He didn't.

Q: Do you remember what Mike was wearing that day?

A:  He had on a hoody gray sweatshirt, light colored blue jeans, white tennis shoes, he had on boxers white with stripes.  White undershirt.

Q:  Have you ever seen Mike driving that van before?

A:  No.

Q:  Did Mike say the van was his?

A:  Yeah.

Q:  Did you ever see the van after this incident?

A:  No, we saw a van just like it, on Saturday April 13, 2002, at W. 99th and Loretta.  It was the same color, dark windows with the bars on top.  It had the air freshener hanging from the mirror.  I was with my mom and my * * * real dad [who] took down the license plate number BT57AV Dodge Caravan.

Q:  Have you seen Mike since this incident?

A:  No.

* * *

Q:  Did Mike threaten you that day?

A:  He said, if I didn't stop moving around and crying he was going to get his pistol.

* * *

Q:  Did you lose something in the van?

A:  Yes, a red hair tie with a silver metal piece.

- **May 10, 2019 Cold Case Investigation Report**

{¶ 17} A Cold Case Investigation Incident Report was issued by the prosecutor's office on May 10, 2019.  The pertinent parts of this report are as follows.

{¶ 18} BCI Special Agent Stacey Fifer ("Fifer"), who authored this report, met with A.N. on May 9, 2019. A.N. agreed to participate in the cold case investigation.

{¶ 19} "[A.N.] was reported missing by her mother * * * on April 4, 2002, after [her mother] called CPD to report [A.N.] did not return home. CPD located [A.N.] a short time later as she was walking northbound on West 90th Street. [A.N.] relayed to CPD that she was just raped." A.N. made a written statement to the police on April 23, 2002. She identified the man who allegedly raped her as "Mike" and described him as "20 years of age, about 5'6" or 5'7", short brown hair, brown eyes, small face, mustache/goatee, and about 190 pounds." A.N. "went willingly with the suspect in his van after he purchased cigarettes."

{¶ 20} A.N. selected Miller from a photo lineup as the male who raped her in 2002. A.N. told Fifer that "she lied about a couple facts when she was 14 years old because she was scared and had problems at home. [A.N.] told agents she would clarify what she was untruthful about and she further stated that she was not believed by her parents or by the police. [A.N.] was adamant that the incident was not consensual."

{¶ 21} A.N. told Fifer that the following details from the statement she provided to the Sex Crimes Unit were inaccurate: "[S]he lied about the suspect's name being 'Mike' because she did not want her parents to know she got in a car with a stranger. * * * [S]he clarified that she first saw the suspect in the area of Loretta Avenue by the store. She said her statement was mostly accurate." A.N. told

Fifer that, prior to the alleged rape, she had seen the male "a couple times at the park" and they "said hey to each other." A.N. did not know him by name but recognized him. On April 4, 2002, this male bought her cigarettes, and "asked her if she wanted a ride home and she accepted."

{¶ 22} A.N. described the van to Fifer: "[It] was an old, 'small box' van. She further described the van as 'bluish grey' with a gap between the front seats and a longer seat in the rear." A.N. said that "the sexual assault happened in the rear seat of the van" and "the rubber band from her hair fell out and was left in the van." According to the cold case report, approximately two weeks after the incident, A.N.'s father "made her take him to [the] area where she was raped, and she saw the suspect's van parked in front of their house." A.N. told Fifer that she "now thinks that the suspect may have borrowed the van." The 1992 light blue Dodge Caravan (BT57AV) was registered to Sam Eadeh.

## III. Motion to Dismiss for Preindictment Delay

{¶ 23} The state's sole assignment of error alleges that the trial court erred in granting Miller's motion to dismiss. "Decisions to grant or deny a motion to dismiss on grounds of preindictment delay are reviewed for an abuse of discretion." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33. "Courts reviewing a decision on a motion to dismiss for pre-indictment delay accord deference to the lower court's findings of fact but engage in a de novo review of the lower court's application of those facts to the law." *State v. Henley*, 8th Dist. Cuyahoga No. 86591, 2006-Ohio-2728, ¶ 7.

{¶ 24} In *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 11, the Ohio Supreme Court held that "when unjustifiable preindictment delay causes actual prejudice to a defendant's right to a fair trial despite the state's initiating of prosecution within the statutorily defined limitations period, the Due Process Clause affords the defendant additional protection." There is a "firmly established burden-shifting framework for analyzing a due-process claim based on preindictment delay. Once a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Id.* at ¶ 13. In other words, "unjustifiable delay does not violate due process unless it results in actual prejudice." *Id.* at ¶ 16.

{¶ 25} The *Jones* Court further held that "the proven unavailability of specific evidence or testimony that would attack the credibility or weight of the state's evidence against a defendant and thereby aid in establishing a defense may satisfy the due-process requirement of actual prejudice." *Id.* at ¶ 25. To be more specific, "[a]ctual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Id.* at ¶ 28.

## IV. Analysis

{¶ 26} Although this is the state's appeal, Miller had the burden in the trial court of showing actual prejudice because of the preindictment delay. We note that our standard of review requires us to give deference to the lower court's findings of

fact regarding Miller's motion to dismiss. However, in this case, the trial court did not make any findings of fact nor did it apply any facts to the law.

{¶ 27} To support his motion to dismiss, Miller argued that he "suffered six distinct forms of prejudice." First, that Sorrells, who spoke with A.N. on the date of the alleged offense and authored the April 4, 2002 report, is unavailable to testify. Miller argues that he would be prejudiced because the officer would not be able to testify "as to [A.N.'s] demeanor" on the day in question and the "chain of custody with respect to the rape kit."

{¶ 28} To succeed in the first stage of the "burden-shifting framework for analyzing a due-process claim based on preindictment delay," Miller needed to present evidence that Sorrells would be unavailable to testify and that Sorrell's alleged testimony would be relevant to the defense, would minimize or eliminate the state's evidence, and would bolster the defense. *Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 13. Upon review, we find that Miller failed to carry this burden. Miller did not establish that Sorrells would be unavailable to testify, nor did he establish the gist of testimony that Sorrells would supply. In other words, is it unclear whether Sorrell's testimony would hurt or help the defense. Although Sorrell's speculative testimony about A.N.'s demeanor may be relevant to the case, we cannot say that its absence would hurt the state and bolster the defense. *Id.* at ¶ 23 (We review actual prejudice claims "vis-à-vis the particular evidence that was lost or unavailable as a result of the delay and, in particular, considered the relevance of the lost evidence and its purported effect on the defense.").

**{¶ 29}** Additionally, the state may establish the chain of custody of A.N.'s rape kit through witnesses other than the responding officer, as well as documentary evidence. *See State v. Muhammad*, 8th Dist. Cuyahoga No. 104111, 2016-Ohio-8322, ¶ 20 (there was "overwhelming competent, credible evidence establishing * * * the chain of custody of the DNA evidence" when "the state presented testimony from more than a dozen witnesses (along with related supporting documents) detailing the chain of custody of the relevant [rape kit] evidence * * *.").

**{¶ 30}** Second, "the recording of the 9-1-1 call to which Sorrells would have been responding is no longer available." The 911 call was made by A.N.'s mother to report A.N. missing. The call was not about the alleged rape, because at the time she made the call, A.N.'s mother did not know about the incident. Miller failed to show that this missing recording would minimize or eliminate the state's evidence and bolster his defense.

**{¶ 31}** Third, Miller's sister Ashley is unavailable to testify. According to Miller, Ashley "would have been able to testify to at least two occasions on which A.N. spent time with * * * Miller on his mother's porch, smoking marijuana. This would have undercut A.N.'s claim that * * * Miller was not well-known to her, and her credibility in general." In A.N.'s April 23, 2002 statement to the police and her May 9, 2019 statement to Fifer, she admits that she met Miller a few times prior to the incident in question. She also explains why she lied about initially reporting that she did not know the man who raped her. Miller failed to show that this arguably

unavailable testimony would minimize or eliminate the state's evidence and bolster his defense.

{¶ 32} Fourth, Miller's mother is unavailable to testify, and she would have been able to corroborate Ashley's testimony. For the same reasons that Miller failed to show how Ashley's alleged testimony would prejudice him, we find that he failed to show how his mother's unavailable alleged testimony would prejudice him.

{¶ 33} Fifth, the van in question in this case is "no longer available." Miller argues that "A.N. indicated she left a hair tie inside the van, the absence of which would have further undercut her claim. Additionally, there was no opportunity to process the van to see if her claim of ejaculation inside the van was true and whether any forensic evidence of any kind could be revealed." In A.N.'s April 23, 2002 statement, she told the police that she did not know if Miller ejaculated. While this missing evidence may be relevant to Miller's defense, Miller has failed to show how the van would eliminate or minimize the state's evidence and bolster his defense. DNA evidence establishes that Miller's semen was found on A.N.'s rape kit. Miller has not set forth any argument about how evidence that may or may not be found in the van would attack this DNA evidence or tend to "undercut" A.N.'s credibility.

{¶ 34} Sixth, "the defense's inability to determine whether any of the other officers involved in the 2002 investigation of this case are available." According to Miller, Officers Rave and Fitzpatrick "investigated the case for approximately a month and ultimately dropped it. * * * One officer was only known to the defense by [his or her] last name, and the other is no longer on the force." Assuming without

deciding that these police officers are unavailable to testify, Miller has failed to show how their testimony would be relevant to his defense, would minimize or eliminate the state's evidence, and would bolster his defense.

{¶ 35} We are mindful that 12 years has passed between the alleged rape and testing of the rape kit. Another two years passed before Miller was linked to the DNA found in the rape kit, and an additional three years passed before the state indicted Miller. This timeline does not put the state's preindictment delay in a good light. However, the burden-shifting analysis set forth by the Ohio Supreme Court in *Jones* made clear that, before courts review whether the state's delay was unjustifiable, the defendant must present evidence of actual prejudice. Miller did not identify any missing or unavailable evidence, in the trial court or here on appeal that would cut into the state's case and bolster his own. There were no witnesses to the alleged rape, and at this early stage of the proceedings, Miller is not refuting the DNA evidence. This case appears to be a classic "he said, she said," which typically puts consent as the factual issue. A.N. is available to testify, and Miller has not shown that without the missing or unavailable evidence, he is unable to attack her credibility. In other words, he failed to show actual prejudice.

{¶ 36} Accordingly, we find that the court abused its discretion by granting Miller's motion to dismiss for preindictment delay. The state's sole assignment of error is sustained. The trial court's judgment is reversed, and this case is remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MICHELLE J. SHEEHAN, J., CONCURS;
LARRY A. JONES, SR., P.J., DISSENTS WITH SEPARATE OPINION

LARRY A. JONES, SR., P.J., DISSENTING:

**{¶ 37}** Respectfully, I dissent and would affirm the trial court's judgment granting Miller's motion to dismiss the case due to preindictment delay.

**{¶ 38}** "A court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett,* Slip Opinion No. 2020-Ohio-6699, ¶ 19. In this case, the trial court had the discretion to grant or deny the motion to dismiss and the court's exercise of that discretion in granting the motion was not outside the legally permissible range of choices, or "the fair limits of judicial choice." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 372, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961) (Frankfurter, J., dissenting).

**{¶ 39}** As with most of these types of cold cases, this case was very fact dependent. Although the trial court did not state its specific findings of facts, I would

find that the trial court's decision that Miller showed actual prejudice and that the state was not able to establish a justifiable reason for its delay in indicting him was not an abuse of its discretion.