[Cite as *State v. Bost*, 2021-Ohio-2190.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellant | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | Case No. 2020 CA 00050 |
| | : | |
| NAJLA Y. BOST | : | |
| | : | |
| | : | |
| Defendant-Appellee | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Licking County Court of
Common Pleas, Case No. 2018 CR
00962

JUDGMENT:                                   AFFIRMED

DATE OF JUDGMENT ENTRY:        JUNE 29, 2021

APPEARANCES:

For Plaintiff-Appellant:                       For Defendant-Appellee:

WILLIAM C. HAYES                          APRIL F. CAMPBELL
LICKING COUNTY PROSECUTOR       Campbell Law, LLC
                                                     46 ½ N. Sandusky Street
PAULA M. SAWYERS                        Delaware, OH 43015
ASST. PROSECUTING ATTORNEY
20 S. Second Street, 4th Floor            PRIYA D. TAMILARASAN
Newark, OH 43055                           175 S. Third St., Suite 200
                                                     Columbus, OH 43215

*Delaney, J.*

{¶1} Plaintiff-Appellant State of Ohio appeals the August 11, 2020, judgment entry of the Licking County Court of Common Pleas. Defendant-Appellee is Najla Y. Bost.

## FACTS AND PROCEDURAL HISTORY

### The 2012 Death of Terrance Hughes

{¶2} On January 14, 2012, officers with the Reynoldsburg Police Department were dispatched to a residential home on the report of a shooting. When they arrived at the two-story home, they found the body of 28-year-old Terrance A. Hughes on the second floor. The police investigation determined Hughes died of three gunshot wounds inflicted by his girlfriend, Defendant-Appellee Najla Y. Bost. Bost admitted to shooting Hughes but claimed she did so in self-defense.

{¶3} Bost gave a voluntary written statement to the Reynoldsburg Police Department on January 14, 2012. (May 22, 2020 Evidentiary Hearing, State's Exhibit 6). She stated she, Hughes, and her three children had moved into the home a few weeks before and had been fighting since the move. After one fight, Bost stated Hughes threatened to kill her and her children. She hid Hughes' gun and then hid from him in the home. On January 12, 2012, Hughes quit his job. Bost was upset that he quit his job and they got into a fight. Bost said Hughes threatened her and her children if she did not shut up and be grateful. On January 14, 2012, Bost said Hughes woke her early in the morning. He told her he had wasted three years on her, and no one cared about him. Bost told Hughes she was going to her friend's house to separate from him for a while until he cooled off. She went into the master bathroom to take a shower and call her friend. She said Hughes came into the master bathroom and choked her while he held her against

the toilet. She begged him to stop, and he let her go. They yelled at each other, and he threw a shoebox of money at her. She started to clean up the mess. He said he was going to get something for her, went to the garage, and started the car. She thought he was leaving so she called him on his cell phone, but he hung up. He came upstairs and said he was getting in the shower but told Bost to sit on the bed and not move. He pulled a gun from the pocket of his robe. Bost said Hughes hit her with the gun and stuck it in her mouth. He took the gun out of her mouth and started waving it around while he spoke to her in a calm voice. When he looked out the window, Bost said she ran but he grabbed her in the hallway and threw her into the hallway bathroom. He started to choke her again and they both fell into the shower curtain and the tub. Bost said the gun went off once. Hughes dropped the gun and Bost picked it up. She closed her eyes and pulled the trigger. When she opened her eyes, Hughes was laying on the floor, not moving. She put towels around him to stop the bleeding. She called her friend because she did not know what to do and when the police came, she let them in.

{¶4} The Reynoldsburg Police Department investigated the shooting. On May 18, 2012, Licking County Prosecuting Attorney Kenneth W. Oswalt issued the following press release stating no charges would be filed against Bost for the shooting:

As part of the investigation into this shooting the residence of Firstgate Drive was processed by field agents with the Bureau of Criminal Investigation and Identification (BCI&I). In addition, since that time various forensic testing has been conducted by various sections of the BCI&I laboratory. During that same period of time detectives from the Reynoldsburg Police Department, in consultation with this Office, have

conducted multiple interviews designed to explore all aspects of the circumstances leading up to Mr. Hughes' death.

That investigation resulted in a determination that Mr. Hughes died as a result of three gunshot wounds inflicted by his girlfriend, Najla Y. Bost, then 25 years of age, a resident of the same address. Ms. Bost claimed to have shot Mr. Hughes in self-defense. As a result of a thorough review of all of the evidence obtained, this Office, in consultation with the Reynoldsburg Police Department, concludes that there is insufficient evidence to counter or disprove Ms. Bost's claim of having acted in self-defense.

Accordingly, no charges will be filed out of this incident. Should new evidence surface, as in any case, this incident could be again reviewed based upon that new evidence. For now, the case is being closed without charges.

### The 2018 Indictment for the Death of Terrance Hughes

{¶5} On December 27, 2018, Licking County Prosecuting Attorney William C. Hayes obtained an indictment charging Bost with murder, in violation of R.C. 2903.02(A), with a firearm specification.

{¶6} Bost entered a plea of not guilty to the charges. The trial court granted Bost's request for funds to obtain a psychological expert to conduct a domestic violence evaluation. Bost claimed the shooting was in self-defense and she suffered from Battered Woman Syndrome due to the domestic violence she suffered from Hughes during their relationship.

{¶7} On February 12, 2019, the State filed the Bill of Particulars. The State recited the facts of the shooting and stated:

The defendant admitted to the shooting. The defendant provided several conflicting accounts as to where the parties were upstairs when the shooting occurred. The victim [sic] waited an hour before calling anyone.

(Bill of Particulars, Feb. 12, 2019).

### Motion to Dismiss for Preindictment Delay

{¶8} On September 24, 2019, Bost filed a motion to dismiss due to preindictment delay. Bost contended she suffered actual prejudice from the delay in the indictment after the State closed the investigation on May 18, 2012 with no charges. She argued that evidence including Hughes' cell phone, Bost's physical injuries, and the contents of the home were no longer available to assist in her defense. The seven-year delay in bringing the charges cause her actual prejudice in that her ability to defend was significantly impaired by various pieces of evidence which were no longer available.

{¶9} Bost also filed a motion for disclosure of the Grand Jury transcript. The State opposed the motion. The State also filed a motion in limine on September 30, 2019.

### Release of Grand Jury Transcript

{¶10} On October 25, 2019, the trial court held an evidentiary hearing on the pending motions from Bost and the State. At the hearing, the trial court admitted as evidence the "Report of Domestic Violence Psychological Evaluation: Najla Bost" completed by Dr. Karla Fischer. In conducting the examination, Dr. Fischer interviewed Bost and Mariam Leggon, Bost's mother. She reviewed the discovery file provided by Bost's trial counsel, which included the investigation conducted by the Reynoldsburg

Police Department and scene investigation and forensic testing by the BCI. The report gave the opinion that Bost was a battered woman and Bost had the intent of protecting herself and her children from Hughes' violent behavior, not to cause Hughes' death.

{¶11} On November 5, 2019, the trial court granted the motion to release the grand jury transcript after an in camera review. It cited to the Bill of Particulars and found it did not reference or allege any new facts or evidence. It held the Bill of Particulars appeared to directly contradict the statements made by the police department and the Licking County Prosecutor's Office in 2012 when the investigation was concluded without charges. The trial court found there was a particularized need to disclose the grand jury transcript due to the length of time between the shooting and indictment and the conflicting assertions by the Reynoldsburg Police Department and Prosecutor's Office in 2012 and 2018. The grand jury testimony was released by the trial court on November 20, 2019.

{¶12} At the grand jury proceedings, the State called Sergeant Ron Wright of the Reynoldsburg Police Department to testify. He was a patrol sergeant on January 14, 2012 and was one of the first responding officers on the scene. (May 22, 2020 Evidentiary Hearing, Defense Exhibit C). The following is his testimony relevant to this appeal. Sgt. Wright was shown State's Exhibit 2, which was a photograph of a computer desk located in the downstairs of the home. There was a laptop computer on the desk and the photograph showed there was math homework on the screen of the laptop. The State alleged the homework was for Hughes. (State's Exhibit 3, T. 5-6). The State asked whoever was on the computer at that particular time, was he doing homework? Sgt. Wright answered in the affirmative. (T. 6). A grand jury member asked Sgt. Wright if he

still had access to the software where it may have been saved before Hughes went upstairs. Sgt. Wright answered that he did not. (T. 7).

{¶13} Sgt. Wright testified that he observed Hughes' body in the upstairs hallway and the gun laying on the floor. He was shown State's Exhibit 7, which was a photograph of the upstairs hallway bathroom. (T. 10). It showed a shower curtain pressure rod laying on the toilet. The shower curtain was attached to the rod and partially inside the tub. Lt. Wright testified that no other objects in the bathroom, other than the shower curtain rod, appeared disturbed or knocked down. Based on his experiences, after a domestic violence struggle, Sgt. Wright testified he thought the other objects in the room would have been knocked down. (T. 14, 17). He did not believe the state of the hallway bathroom was consistent with a struggle. (T. 17). He stated as to the shower curtain:

> * * * And I would like to point out the shower curtain. So, if they fell into the tub, as she described, I would think the shower curtain and rod would end up in the tub, not laying on the outside because the shower rod would be in the way and would probably be bent if it was on the outside – the leverage between the toilet and where it is on the floor if they landed on top of it, would have probably bent that shower rod.

(T. 14).

### Evidentiary Hearing on Motion to Dismiss for Preindictment Delay

{¶14} On May 22, 2020, the trial court held an evidentiary hearing on Bost's motion to dismiss for preindictment delay. The following evidence was adduced at the hearing.

{¶15} Detective Timothy Doersam of the Reynoldsburg Police Department was the lead detective assigned to the investigation of the shooting. He was not personally at the scene on the night of the shooting, but he interviewed Bost on the night of the shooting and re-interviewed her a few days later at the request of her defense counsel. (T. 23). He also interviewed Bost's two young children who said they had witnessed Hughes assault Bost. (T. 55-56). His supervisor, Sergeant Bauchmoyer was on duty at the time of the shooting, and he investigated the scene with the assistance of Detective Binder. (T. 22). He testified as to the physical evidence collected at the scene. As part of the investigation, the police did not collect Hughes' laptop computer, the shower curtain from the hallway bathroom, or the shower curtain rod from the hallway bathroom. (T. 11).

{¶16} The police collected the cell phones used by Bost and Hughes. The police were able to analyze Bost's cell phone to collect phone calls, texts, and a few images. (T. 16). The police were able to partially analyze Hughes' cell phone because it was passcode protected, only the SD card could be reviewed. (T. 17). The investigators did not obtain records from the cell phone provider. Det. Doersam testified there was technology that could unlock more cell phones today than could in 2012. (T. 18). Hughes' cell phone was released to his family after the close of the investigation. (T. 9).

{¶17} The investigation into the shooting took approximately five months. (T. 21). Det. Doersam was aware of the State's theory that the hallway bathroom and shower curtain rod were staged. In 2012, no one at the scene relayed to Det. Doersam that they felt there any indications that it was a staged scene. (T. 12). Since the close of the investigation, no new evidence had been collected. (T. 21). The State stipulated that the

investigation case file was the same at the indictment as it existed at the time the investigation was closed. There was no new evidence. (T. 93).

{¶18} Sgt. Wright testified that he was first on the scene, but because he was on the patrol division, the patrol division turned the scene over to the detectives to continue the investigation. (T. 73). Bost offered the grand jury testimony as Defendant's Exhibit C, which was admitted into evidence. (T. 66).

{¶19} Special Agent Joshua Durst of the Ohio Bureau of Criminal Investigation next testified as to his investigation of the scene. Nothing in the crime scene indicated to him that it was altered or staged, and he was not told by the police that it was staged. (T. 108). If he had been told that the shower curtain rod had been purposefully placed, Durst may not have collected the rod. (T. 109). The investigating officers would have discussed it at the time and determined whether there would be any laboratory analysis available to confirm or refute the theory. (T. 109).

{¶20} SA Durst's investigation showed that the shots were fired from within the bathroom or an area right there at the bathroom. (T. 110). He was not able to determine the trajectories of the bullets. (T. 103). One spent bullet casing was found in the sink of the hallway bathroom. (T. 120). Three spent bullet casings were found behind the bathroom door, which opened into the bathroom. (T. 120). No bullet holes were found in the bathroom. (T. 123).

{¶21} Bost's mother, Mariam Leggon was the last witness. She testified that she called 911 after the shooting. Leggon testified that Bost was the caretaker for Mary Bost, Leggon's mother and Bost's grandmother. Mary Bost passed away in February 2012. (T. 172). Leggon was not aware that Hughes had previously been violent towards Bost. (T.

161). Mary Bost allegedly told Leggon that something was not right in Bost's relationship with Hughes and Leggon should check on Bost. (T. 162). Bost was not getting things done around the house and Hughes was coming over and calling a lot during the day. (T. 162). The Reynoldsburg Police Department did not interview Mary Bost. (T. 162).

{¶22} At the close of the evidentiary hearing, Bost asked the trial court to consider the "Report of Domestic Violence Psychological Evaluation: Najla Bost" completed by Dr. Karla Fischer. (T. 173-174). The report was submitted with Bost's motion to dismiss and admitted at the October 25, 2019 oral hearing. (T. 173).

**Judgment Entry**

{¶23} On August 11, 2020, the trial court issued its judgment entry granting the motion to dismiss for pre-indictment delay. The trial court applied the two-factor burden shifting framework as espoused by the Ohio Supreme Court in *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984) and *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688. The trial court first found that Bost showed she was actually prejudiced because she could no longer present evidence of her injuries after the shooting, including electronic records from Hughes' cell phone and computer, physical evidence from the scene of the shooting, and testimony from Mary Bost, who was deceased. The trial court next found the State failed to present evidence of a justifiable reason for the delay. The State argued it made an error in judgment when the former Licking County Prosecutor determined Bost would not be charged. Pursuant to *Luck*, the trial court found the delay was unjustified when the State through negligence or error in judgment ceased the active investigation of a case but then later decided to commence

prosecution on the same evidence that was available when the original investigation ceased. *Luck*, 15 Ohio St.3d 150, 158.

{¶24} It is from this judgment the State now appeals.

## ASSIGNMENTS OF ERROR

{¶25} The State raises one Assignment of Error:

{¶26} "THE TRIAL COURT ERRED BY GRANTING APPELLEE'S MOTION TO DISMISS FOR PREINDICTMENT DELAY."

## ANALYSIS

{¶27} In its sole Assignment of Error, the State contends the trial court erred when it granted Bost's motion to dismiss for preindictment delay. Upon our review of the record and the relevant case law, we disagree.

### Standard of Review and Applicable Law

{¶28} "Decisions to grant or deny a motion to dismiss on grounds of preindictment delay are reviewed for an abuse of discretion." *State v. Miller*, 8th Dist. Cuyahoga No. 109543, 2021-Ohio-1878, 2021 WL 2255032, ¶ 23 quoting *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33. "Courts reviewing a decision on a motion to dismiss for pre-indictment delay accord deference to the lower court's findings of fact but engage in a de novo review of the lower court's application of those facts to the law." *Id.* quoting *State v. Henley*, 8th Dist. Cuyahoga No. 86591, 2006-Ohio-2728, ¶ 7.

{¶29} The Sixth Amendment to the United States Constitution guarantees a speedy trial to a person who has been accused of a crime. *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 11. On its face, however, the Sixth Amendment

does not provide protection to those that have not yet been accused of a crime; "it does not 'require the Government to discover, investigate, and accuse any person within any particular period of time.' *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)." *Id.* In *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 11, the Ohio Supreme Court held that "when unjustifiable preindictment delay causes actual prejudice to a defendant's right to a fair trial despite the state's initiating of prosecution within the statutorily defined limitations period, the Due Process Clause affords the defendant additional protection." Preindictment delay between the commission of the offense and a defendant's indictment violates due process only when: (1) it is unjustifiable and (2) causes actual prejudice. *Id.* at ¶ 12 citing *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus. There is a "firmly established burden-shifting framework for analyzing a due-process claim based on preindictment delay. Once a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Id.* at ¶ 13. In other words, "unjustifiable delay does not violate due process unless it results in actual prejudice." *Id.* at ¶ 16.

{¶30} Before we begin our review, we note that determining whether a preindictment delay constitutes a due process violation requires an intricate and complicated analysis, as seen by the large number of Supreme Court and appellate opinions wrestling with the issue. *See State v. Bourn*, 8th Dist. No. 107525, 2019-Ohio-2327, appeal allowed, 157 Ohio St.3d 1510, 2019-Ohio-5193, 136 N.E.3d 499; *State v. Willingham*, 8th Dist. Nos. 106706, 107033, 2019-Ohio-1892, appeal dismissed as being improvidently accepted, 160 Ohio St.3d 346, 2020-Ohio-3475.

## Actual Prejudice

{¶31} This is the State's appeal but at the trial level, Bost had the burden of demonstrating the State's delay caused actual prejudice to her defense. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones*, 2016-Ohio-5105 at ¶ 28. "The proof of actual prejudice must be specific, particularized and non-speculative." *State v. Hines*, 3rd Dist. Marion No. 9-19-07, 2019-Ohio-5039, ¶ 12 quoting *State v. Strickner*, 10th Dist. Franklin No. 03AP-746, 2004-Ohio-3557, ¶ 36.

{¶32} "The determination of 'actual prejudice' involves 'a delicate judgment based on the circumstances of each case.'" *State v. Hines*, 2019-Ohio-5039 at ¶ 13 quoting *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 51, quoting *Marion*, *supra*, at 325. "A court must 'consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay.'" *Jones*, 2016-Ohio-5105 at ¶ 20, quoting *Walls* at ¶ 52.

{¶33} The *Jones* Court held that "the proven unavailability of specific evidence or testimony that would attack the credibility or weight of the state's evidence against a defendant and thereby aid in establishing a defense may satisfy the due-process requirement of actual prejudice." *Jones*, 2016-Ohio-5105 at ¶ 25. However, "the possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 103. The Court cautioned that did not mean, however,

that demonstrably faded memories and actually unavailable witnesses or lost evidence cannot satisfy the actual prejudice requirement. *Jones, supra* at ¶ 21. In examining the alleged actual prejudice and preindictment delay, the Supreme Court guided that the court "scrutinize[] the claim of prejudice vis-à-vis the particular evidence that was lost or unavailable as a result of the delay and, in particular, consider[] the relevance of the lost evidence and its purported effect on the defense." *Jones, supra*, at ¶ 23.

{¶34} In the present case, the trial court found Bost provided ample evidence of actual prejudice. We examine the trial court's conclusions and note the standard of review in this case requires us to give deference to the trial court's findings of fact regarding Bost's motion to dismiss.

*Evidence of Bost's Physical Injuries*

{¶35} In the domestic violence evaluation report, Dr. Fischer recites Bost's account of the first time Hughes physically assaulted her. The report does not provide a date of the first assault. Bost stated that Hughes grabbed her by the front of her shirt and began strangling her until she saw white. Bost could not breathe, and she felt like her head was going to explode. After Hughes released her, Bost could not speak and was coughing. Her neck was red and then turned dark purple. (Dr. Fischer Report, p. 7). Bost recounted other incidents prior to the shooting where Hughes had assaulted her: Hughes slapped and strangled her, which her children witnessed (Dr. Fischer Report, p. 8); Hughes slapped her so hard there was ringing in her ears afterwards (Dr. Fischer Report, p. 8); Hughes shoved her, put her in a bear lock, then flung her down (Dr. Fischer Report, p. 8); on the day of the shooting, Hughes had his hand on her throat and banged the back of her head against the shower and yanked her head back, causing a large and painful

bump on the back of her head a day or two later (Dr. Fischer Report, p. 13); and right before the shooting, Hughes held her throat, put the gun against her side, and forced her against the bathroom sink, which caused a deep contusion injury on her back documented in the police investigation (Dr. Fischer Report, p. 10, 14).

{¶36} It was the opinion of Dr. Fischer that Bost suffered chronic and life-threatening abuse by Hughes, leading in part to her conclusion that Bost suffered from Battered Woman Syndrome. She opined that Bost may have experienced a brain injury due to the severity of the strangulation and direct blows to her head. The symptoms of a brain injury could include problems with memory and concentration, sleep, headaches, depression and anxiety. (Dr. Fischer Report, p. 18). She further stated,

> Brain injury in battered women occurs in up to 74% of domestic violence victims. [Footnote omitted.] * * * In contrast to brain damage, brain injuries typically heal over time, although individuals can continue to experience the psychological effects for a substantial time afterwards. In my experience, victims who have likely suffered brain injury have the most difficulty with memory immediately after a physical trauma, while symptoms of anxiety and depression are likely to emerge later and persist for some time.

(Dr. Fischer Report, p. 18).

{¶37} In her motion to dismiss, Bost argued she suffered from Battered Woman Syndrome, and she shot Hughes in self-defense. She stated that she suffered physical injuries, including a brain injury, due to Hughes' chronic and life-threatening domestic violence, which was an element which Dr. Fischer used to diagnose Bost with element of Battered Woman Syndrome. Bost contended the preindictment delay prevented her from

confirming her injuries with medical tests because her injuries healed during the passage of time from the offense to the indictment. The State countered that the evidence of a brain injury was merely speculative because she was examined after the shooting and there was no medical evidence that she suffered from a head injury. Further, Bost could have sought additional medical testing in 2012 if she were concerned there was a possible brain injury.

{¶38} The trial court agreed that if medical testing had been done in 2012, the testing would have provided conclusive evidence whether Bost suffered a brain injury due to Hughes' physical assaults. That Bost had a physical injury was bolstered by the medical records from 2012 confirming that Bost suffered a deep contusion injury to her back. Bost would have less reason in this case to independently obtain medical testing because on May 18, 2012, the State closed the case without charges, stating it would not review the case unless new evidence was discovered. The State stipulated that no new evidence has been discovered.

{¶39} Bost argues she committed the shooting in self-defense, and she suffered from Battered Woman Syndrome. We agree that medical confirmation in 2012 of her physical injuries, including a brain injury, would have aided in establishing her claims of self-defense and Battered Woman Syndrome and the proven unavailability of that evidence was actual prejudice. The unavailability of evidence as to Bost's physical and/or brain injuries was also prejudicial considering the Bill of Particulars where the State specified, "The defendant provided several conflicting accounts as to where the parties were upstairs when the shooting occurred." As reported by Dr. Fischer, a person suffering from a brain injury may have difficulty with memory after a physical trauma.

{¶40} In this case, we find no abuse of discretion for the trial court to find that Bost suffered actual prejudice by the preindictment delay because evidence of her physical injuries was lost due to the passage of time.

*Evidence on Hughes' Cell Phone*

{¶41} Bost contended the unavailability of Hughes' cell phone and its records caused her actual prejudice to bolster her claim that the shooting was in self-defense. In the Bill of Particulars, the State detailed that Bost "provided several conflicting accounts as to where the parties were upstairs when the shooting occurred. The victim [sic] waited an hour before calling anyone." Bost contends the contents of Hughes' cell phone could help establish a timeline of events before the shooting to minimize the impact of the State's evidence that Bost waited an hour before calling anyone.

{¶42} In this case, we find it is speculative that Hughes' cell phone data would help verify Bost's account of events. First, there is no dispute that the Reynoldsburg Police Department attempted to obtain the data from Hughes' cell phone but could not because of the passcode. Det. Brian Marvin was responsible for digital forensics during the investigation. (T. 131). Det. Marvin testified that based on the technology in 2012, he could not bypass the passcode on Hughes's cell phone. (T. 133). Det. Doersam testified that while technology is better in 2018, "it's still not 100 percent on all phones 100 percent or all of the time, but it – it does seem like you can unlock more phones now than you – than you did – it's natural technology." (T. 18). The trial court is correct that the contents of the cell phone cannot be used by the defense to assess reliability and consistency of the allegations against her, but we find it is speculative to say the contents of the cell phone would be available to her based on the passcode protection. Bost also argues

Hughes' cell phone records are necessary to verify her version of the timeline on January 14, 2012. In Bost's written statement, she stated she called him on the cell phone and he hung up. The investigators were in possession of Bost's cell phone records.

{¶43} We find that even if the cell phone were available today, there is only speculation that the passcode protection could be bypassed today when it could not be bypassed in 2012. No evidence was presented that a password-protected cell phone from 2012 could be bypassed. We agree with the trial court's factual determination that the cell phone is unavailable but based upon our de novo review of the facts applied to the law of actual prejudice, we disagree that its unavailability was prejudicial to Bost's defense or credibility.

*Evidence from the Home*

{¶44} In Bost's written statement, she said that after she and Hughes fought upstairs, Hughes went downstairs, came back upstairs, and threatened her with a gun. She tried to run away but Hughes grabbed her and threw her into the hallway bathroom. They struggled in the bathroom and fell into the shower, where the gun fell and went off.

{¶45} At the grand jury proceedings, Sgt. Wright testified as to a photograph of a computer sitting on a desk located downstairs. The photograph showed the computer was turned on and had math homework on the screen, allegedly belonging to Hughes. The State conceded to the grand jury it was unknown when Hughes had used the computer or worked on the math homework. The Reynoldsburg Police Department did not examine the data on the computer, nor did it collect the computer as evidence.

{¶46} Sgt. Wright also testified to the photographs of the hallway bathroom. He conjectured that based on his knowledge of other domestic violence struggles, the folded

hand towels hanging over the toilet, the soap dispenser by the sink, and the trashcan by the toilet would have been disturbed. He also believed the shower curtain rod would have been bent if Bost and Hughes had fallen into the tub as described. The investigators did not collect the shower curtain, shower curtain rod, or other objects in the bathroom as evidence.

{¶47} In the Bill of Particulars, the State argued, "[t]he defendant provided several conflicting accounts as to where the parties were upstairs when the shooting occurred." The trial court found the unavailability of the computer and objects from the home was prejudicial to Bost because she could not attack the State's theory that Bost was not truthful as to the location of the parties when the shooting occurred or the timing of the shooting.

{¶48} "[T]he proven unavailability of specific evidence * * * that would attack the credibility or weight of the state's evidence against a defendant and thereby aid in establishing a defense may satisfy the due-process requirement of actual prejudice." *Jones*, 2016-Ohio-5105, ¶ 25. In this case, we agree with the trial court's application of the facts to the law. While the State argues the computer is not relevant to the case, the photograph of the computer was presented to the grand jury to show the state of the scene when Sgt. Wright responded to the shooting of the person who had allegedly used the computer. Bost cannot have her own expert examine the unavailable computer to determine when Hughes logged onto the computer or when the math homework was saved. This information could bolster Bost's timeline of events and her truthfulness as to where the parties were when the shooting occurred.

{¶49} SA Durst testified at the hearing that he could not establish bullet trajectories, but the investigators believed the shots were fired from within the bathroom or an area right there at the bathroom. He did not collect DNA or fingerprints from the bathroom because he expected both Bost and Hughes' DNA and fingerprints to be in the bathroom. He did not collect primer residue because it would be located all over the upstairs and would not indicate where the gun was fired. The State contends the lack of this evidence was not due to preindictment delay and therefore Bost's argument of prejudice must fail as to the contents of the bathroom. *See State v. Morgan*, 2nd Dist. Clark No. 2018-CA-103, 2019-Ohio-3691, ¶ 91.

{¶50} The missing evidence in this case, however, is not limited to DNA, fingerprints, and primer residue. At the grand jury hearing, Sgt. Wright proposed the "shower curtain rod theory" that the scene in the hallway bathroom was not indicative of a struggle, thereby disputing Bost's version of events. The lack of access to the home and the unavailability of the contents of the bathroom and shower curtain rod prevent Bost from preparing a defense to refute Sgt. Wright's opinion of what did or did not occur in the hallway bathroom. Bost has no ability to conduct an independent examination of the items that the State contended did not demonstrate a struggle in the bathroom, such as whether the shower curtain rod would have bent if it fell as shown in the photograph. "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones* at ¶ 28. The unavailability of the objects used by the State to show a struggle did not occur in the bathroom, in direct contravention

of Bost's argument that she shot Hughes in self-defense after they struggled in the bathroom, prejudiced Bost.

*Testimony of Deceased Witness*

{¶51} Bost contended she was prejudiced by the unavailability of a potential witness, her grandmother Mary Bost, because her testimony would have supported her claim that she suffered from Battered Woman Syndrome and shot Hughes in self-defense. Bost stated she and Mary Bost were close and Mary Bost knew about her relationship with Hughes. Bost cared for Mary Bost every day and could have testified to Bost's appearance and demeanor during her relationship with Hughes. Leggon testified Mary Bost asked her to check on Bost because something was not right in her relationship with Hughes.

{¶52} The Ohio Supreme Court held as to a deceased witness:

To be sure, the death of a potential witness will not always constitute actual prejudice. In *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, as in *Luck*, we considered the unavailable evidence in light of the other evidence available at the time of the indictment and in light of its relevance to the defense. We acknowledged that the preindictment death of a witness can constitute prejudice "if the defendant can identify exculpatory evidence that was lost and show that the exculpatory evidence could not be obtained by other means." *Adams* at ¶ 103. *Adams*, however, did not explain what evidence the deceased witness "might have offered," and, moreover, the deceased witness had actually implicated Adams in the

murder before he died; we stated that "[i]f anything, [the witness's] absence at trial was a benefit to Adams's defense." *Id*.

\* \* \*

Jones's inability to articulate specifically what his mother's testimony would have been does not render his claim of prejudice fatally speculative. Indeed, we have held that a defendant may establish actual prejudice where he or she is unable to seek verification of his or her story from a deceased witness. *Luck*, 15 Ohio St.3d at 157, 472 N.E.2d 1097. *Luck* demonstrates that a defendant need not know what the exact substance of an unavailable witness's testimony would have been in order to establish actual prejudice based on the witness's unavailability. Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense. *Id*. at 157–158, 472 N.E.2d 1097. Although defense counsel acknowledged that he did not know how Jones's mother would have testified at trial—because she was never questioned prior to her death—he offered an explanation of "what exculpatory testimony [the witness] might have offered," *Adams* at ¶ 103.

*State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 26, 28.

{¶53} The State argues the trial court erred when it found the unavailability of Mary Bost constituted actual prejudice. It states Bost did not demonstrate that Mary Bost's testimony would bolster her claim of self-defense. In this case, we do not find the unavailability of Mary Bost as a witness constituted actual prejudice. We differentiate the

facts of the present case to those in *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097, where the defendant argued that a 15-year preindictment delay prejudiced her, based on the death of two key witnesses. One of the dead witnesses was purportedly with Luck at the time of the alleged murder, and Luck described that witness as the one person who could have helped her defense. *Id.* at 157. The Court found that although there was no record establishing what that witness would have actually testified to, Luck was "obviously prejudiced by not being able to seek verification of her story from [the witness] and thereby establishing mitigating factors or a defense to the charge against her." *Id.* at 158.

{¶54} Mary Bost was not a witness to the shooting on January 14, 2012, and she could not provide verification of Bost's claim of self-defense. Mary Bost could provide support for Bost's claim of Battered Woman Syndrome; the record, however, shows that Mary Bost was not the only witness who may have known of Hughes' domestic violence. Bost's children were interviewed by the police, and Det. Doersam testified the children witnessed Hughes assault their mother. In this case, we cannot say that Mary Bost's testimony would have minimized or eliminated the impact of the State's circumstantial evidence that Bost did not act in self-defense on January 14, 2012.

*Bost Demonstrated Actual Prejudice*

{¶55} The trial court found the cumulative effect of unavailable evidence demonstrated actual prejudice. While we determined the missing cell phone and unavailable testimony from Mary Bost were not prejudicial, we find that the missing evidence as to Bost's physical injuries and evidence located in the home were prejudicial to Bost because the evidence supported Bost's claim of self-defense and that she

suffered from Battered Woman Syndrome. The trial court did not err when it found Bost demonstrated actual prejudice.

## Unjustifiable Delay

{¶56} In this case, we find that Bost met her burden of demonstrating actual prejudice as to her physical injuries and the evidence located in the home. If the defendant carries the burden of establishing actual prejudice, the State then "bears the burden of producing evidence of a justifiable reason for the delay." *Whiting*, *supra*, 217.

> [D]elay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant, see *United States v. Marion, supra*, or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased. The length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable.

*State v. Hines*, 3rd Dist. Marion No. 9-19-07, 2019-Ohio-5039, 2019 WL 6701730, ¶ 15 citing *Luck, supra* at 158. We note that the State does not address this second step in the burden-shifting analysis in its appeal. The State's appellate brief only addresses the first step in the analysis, whether there was actual prejudice. It is not the duty of an Ohio appellate court to create arguments for the parties and search the record for evidence to support them. *Washek v. Washek*, 5th Dist. Fairfield No. 18 CA 22, 2019-Ohio-1504, 2019

WL 1785411, ¶ 21 citing *Sisson v. Ohio Department of Human Services*, 9th Dist. Medina No. 2949–M, 2000 WL 422396.

{¶57} The trial court cited to the bond hearing as to why the State brought charges against Bost in 2018 after closing the case in 2012:

> MR. MURPHY: Back in 2012, the Defendant did make statements. I don't bel – necessarily believe that those statements were consistent with the evidence that caused a disagreement inside of the Reynoldsburg Police Department. Uh when we went back out and looked at the scene and go through the evidence as outlined by the Defendant as to what occurred, uh what she claims occurred could not have occurred. And what happened is a judgment call was made. It was a bad judgment call. She has literally gotten away with murder in the last seven years.

(Oral Bond Hearing, p. 7-8).

{¶58} The State conceded there was no new evidence in this case. The trial court concluded the State, through error in judgment, ceased the active investigation of the case in 2012, but in 2018, decided to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased; therefore, it was an unjustifiable delay. We find the record supports the trial court's conclusion and it was not an abuse of discretion.

{¶59} Accordingly, the Assignment of Error of the State of Ohio is overruled.

## CONCLUSION

{¶60} The judgment of the Licking County Court of Common Pleas is affirmed.

By: Delaney, J.,

Hoffman, P.J. and

Wise, Earle, J., concur.